1  Mark P. Robinson, Jr., Esq.
   California Bar No. 54426
2  (*Nevada pro hac pending*)
   Daniel S. Robinson, Esq.
3  California Bar No. 244245
   (*Nevada pro hac pending*)
4  **ROBINSON CALCAGNIE, INC.**
   19 Corporate Plaza Drive
5  Newport Beach, CA 92660
   (949) 720-1288; Fax (949) 720-1292
6  mrobinson@robinsonfirm.com

   Robert T. Eglet, Esq.
   Nevada Bar No. 3402
   Robert M. Adams, Esq.
   Nevada Bar No. 6551
   Cassandra S.M. Cummings, Esq.
   Nevada Bar No. 11944
   **EGLET PRINCE**
   400 S. Seventh St., Suite 400
   Las Vegas, NV 89101
   (702) 450-5400; Fax: (702) 450-5451
   eservice@egletlaw.com

7
   Kevin R. Boyle, Esq.
8  (*Nevada pro hac pending*)
   California Bar No. 192718
9  Rahul Ravipudi, Esq.
   Nevada Bar No. 14750
10 **PANISH SHEA & BOYLE LLP**
   8816 Spanish Ridge Avenue
11 Las Vegas, NV 89148
   (702) 560-5520; Fax: (702) 975-2515
   boyle@psblaw.com

12 ***Attorneys for Plaintiffs***

13                **UNITED STATES DISTRICT COURT**

14                   **DISTRICT OF NEVADA**

15 RACHEL SHEPPARD an Individual; LOTUS      ) CASE NO. 2:18-cv-01120
   HERRERA an Individual and as Special Administrator )
16 of the Estate of BRIAN FRASER, decedent;   ) **PLAINTIFFS' MOTION TO REMAND**
   STEPHANIE FRASER as the Guardian Ad Litem for )
17 AUBREE FRASER, a minor; STEPHANIE FRASER  )
   as the Guardian Ad Litem for BRAYDEN FRASER, a )
18 minor; JOVANNA CALZADADILLAS an Individual; ) **Oral Argument Requested**
   FRANCISCO CALZADILLAS an individual;       )
19 NICHOLS ROBONE an Individual; ANTHONY      )
   ROBONE an Individual,                      )
20                                            )
                                              )
21         Plaintiffs,                        )
                                              )
22    v.                                      )
                                              )
23                                            )
   MANDALAY BAY, LLC, f/k/a MANDALAY          )
24 COPRP., a Nevada Domestic Limited-Liability )
   Company; et al.                            )
25                                            )
                                              )
26         Defendants                         )
                                              )
27 ─────────────────────────────────────────

28

                            - 1 -

                    MOTION FOR REMAND

**PLEASE TAKE NOTICE that** Plaintiffs, by and through undersigned counsel, hereby move this Court for an immediate remand of this action to the Eighth Judicial District Court for Clark County, Nevada. A hearing on Plaintiffs' Motion to Remand shall be conducted by the Court on _____, 2018, at _____ pm in or as soon thereafter as the matter may be heard in Courtroom _____ of the United States District Court, District of Nevada, located at _____ (unless the Court deems the matter appropriate for decision without oral argument.

Plaintiffs' Motion to Remand is based on the following grounds:

1. Removal is improper as Plaintiffs' complaint is based entirely on state law claims for relief;

2. The SAFETY Act does not apply to this case; and

3. Remand is appropriate because the removing parties cannot carry their burden of proof that removal is proper.

**RELIEF REQUESTED**

Plaintiffs seek a remand of this action to Nevada District Court, Clark County pursuant to 28 U.S.C. § 1447(c).

Dated: June _29th_, 2018

Robert T. Eglet, Esq.
Robert M. Adams, Esq.
Cassandra S.M. Cummings, Esq.
**EGLET PRINCE**

Mark P. Robinson, Jr., Esq.
Daniel S. Robinson, Esq.
**ROBINSON CALCAGNIE, INC.**

Kevin R. Boyle, Esq.
Rahul Ravipudi, Esq.
**PANISH SHEA & BOYLE LLP**

*Attorneys for Plaintiff*

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

This case concerns the 1 October shooting at the Route 91 Festival (the "Shooting") that resulted in the deaths of fifty-eight (58) people and injured thousands more. Plaintiffs filed a complaint in the Eighth Judicial District Court for Clark County, Nevada alleging ten (10) state causes of action. The First Amended Complaint focuses on the negligence of the Defendants, particularly Mandalay Bay, in literally carrying the gunman's twenty-three (23) semi-automatic assault weapons to his hand-selected, complimentary suite over the course of the week leading up to the Shooting. Mandalay Bay's negligence permitted the gunman the space he needed to set up his weapons and prepare his attack on the Route 91 Festival.

In response to Plaintiffs' obvious state-court complaint, Defendants noticed removal based upon a little-known federal act that appears to never have been invoked in any prior case. Indeed, defense counsel admits in his declaration that this act was unknown to counsel until very recently.

Defendants seek the protections of a federal statute, the "SAFETY Act," that was not intended to protect Defendants or encompass allegations like those asserted by Plaintiffs. The SAFETY Act has never previously been invoked because it is an exceedingly narrow statute that applies only in very specific circumstances – none of which are the case here. The Act was a response to the terrorist attack of September 11, 2001, to encourage companies to get into the business of developing anti-terrorism technology. It was not designed to limit the liability of a hotel that, despite prior incidents, affirmatively assisted a gun man to shoot out of its window and people below. Defendants' reliance upon the SAFETY Act as grounds for removal of this case is unreasonable. In fact, Defendants do not have standing to seek removal under the SAFETY Act because they are not entitled to any of the Act's protections. As such, Plaintiffs respectfully request that this Honorable Court grant the instant Motion and remand this case to the Eighth Judicial District Court for Clark County, Nevada.

## II.   FACTS

The facts underlying this case are well known so far as they relate to the events of October

1, 2017. Defendants' failures that resulted in the Shooting actually began in the week leading up to the Shooting.[1] The Shooter was a VIP guest of Mandalay Bay and, as such, his room charges were compensated by the hotel.[2] Six (6) days before the Shooting, the Shooter checked into a corner suite at Mandalay Bay that he had hand selected.[3] Three (3) days before the Shooting, he checked into the adjoining room.[4] Over the course of his stay, the Shooter was assisted to his room by the bell staff as he brought over twenty (20) bags containing firearms and other tools to carry out his attack.[5] The hotel staff even permitted the Shooter to use the service elevator to bring his bags and other equipment to his room.[6] The Shooter also used power tools to bolt a stairwell door closed, only permitted housekeeping to tend to his room if he was present, and left a "Do Not Disturb" sign on his room for over twelve (12) hours.[7] Despite all of the above, Mandalay Bay did not take any action to investigate the Shooter's actions over the course of his stay.

Approximately, an hour-and-a-half before the Shooting, a HotSOS alarm (indicating that a guest's room door was left ajar for a predetermined amount of time) was triggered on the 32nd floor where the Shooter was located.[8] Mandalay Bay security did not take any action to investigate the alarm for over an hour.[9] When security finally went to investigate the HotSOS alarm, the guard discovered that the stairwell entrance to the 32nd floor had been barricaded with an L-bracket.[10] At 10:00 p.m., the Shooter broke out the windows in his Mandalay Bay hotel rooms and began shooting at the Route 91 Festival across the street.[11] For approximately twenty (20) minutes, the Shooter used an arsenal of weapons firing hundreds of rounds at the Route 91 Festival without interruption, killing 58 guests, and injuring thousands of others.[12]

The operative First Amended Complaint was filed on June 4, 2018 against the following

---

[1] *See,* Plaintiffs' First Amended Complaint, attached as Exhibit "1."
[2] *Id.* at ¶ 45.
[3] *Id.* at ¶ 47.
[4] *Id.* at ¶ 48.
[5] *Id.* at ¶¶ 51-58.
[6] *Id.*
[7] *Id.*
[8] *Id.* at ¶ 63.
[9] *Id.*
[10] *Id.* at ¶ 65.
[11] *Id.* at ¶ 67.
[12] *Id.* at ¶ 69.

- 4 -

Defendants: Mandalay Bay, LLC fka Mandalay Corp.; Mandalay Resort Group; MGM Resorts Festival Grounds, LLC; MGM Resorts Venue Management, LLC; and MGM Resorts International. Plaintiffs allege ten (10) causes of action against Defendants based on state statutes and Nevada common law.[13] Defendants filed the Notice of Removal on June 22, 2018. There are no grounds on which this case should be removed to federal court, and as such, Plaintiffs respectfully request that the case be remanded to the Eighth Judicial District Court for Clark County, Nevada.

## III. ARGUMENT

If, after removal, it appears that the federal district court lacks subject matter jurisdiction, the plaintiff may move to remand the case back to the state court.[14] Here, Defendants removed this action based upon the perceived applicability of the SAFETY Act. The Act does not apply here, thus, Plaintiffs seek to remand this case to the Eighth Judicial District Court for Clark County, Nevada pursuant to 28 U.S.C. §1447(c).

Federal Courts must jealously guard their jurisdiction. *Olmos v. Residential Credit Sols., Inc.*, 92 F. Supp. 3d 954, 955 (C.D. Cal. 2015). This jealousy gets expressed in a lot of ways. Federal courts are particularly skeptical of cases removed from state court. *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992). The strong presumption against removal jurisdiction means that defendants have the burden of establishing, by a preponderance of evidence, that removal is proper. *See id.* Courts "strictly construe the removal statute against removal jurisdiction," so "[f]ederal jurisdiction must be rejected if there is any doubt" about jurisdiction. *Id.*

Federal courts are courts of limited jurisdiction and jurisdictional requirements are strictly construed in favor of the states courts' retention of jurisdiction "because removal constitutes an infringement of state sovereignty." *Payne v. Bank of America, N.A.*, no. 3:09cv00080, 2010 WL 546770 (W.D. Va. Feb. 11, 2010) (citing *Lontz v. Tharp*, 413 F.3d 435, 440 (4th Cir. 2005)). Congress has evidenced a clear intent "to restrict removal and to resolve all doubt about the propriety of removal in favor of retained state court jurisdiction." *Marshall v. Manvilles Sales Corp.*, 6 F.3d 229, 232 (4th Cir. 1993).

---

[13] *See*, Exhibit "1."
[14] 28 U.S.C. §1447(c).

The party seeking removal has the burden of establishing federal jurisdiction, *Holcomb v. Bingham Toyota*, 871 F.2d 109, 110 (9th Cir.1989), and there is a "strong presumption against removal jurisdiction." *Abrego Abrego v. Dow Chem. Co.*, 443 F.3d 676, 685 (9th Cir.2006).

Courts "strictly construe the removal statute against removal jurisdiction. Federal jurisdiction must be rejected if there is any doubt as to the right of removal in the first instance." *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992) (citations omitted). A "strong presumption" exists against removal jurisdiction and "the defendant always has the burden of establishing that removal is proper." Id.

The United States District Court for the District of Nevada follows the jurisprudence set by the Supreme Court and Ninth Circuit as it relates to removal of state court actions. In Nevada, as with other federal jurisdictions, "[t]he removal statutes are construed restrictively, and any doubts about removability **are resolved in favor of remanding the case to state court**." *Greene v. Wyeth*, 344 F.Supp.2d 674, 678 (D. Nev. 2004)(emphasis added). There is a presumption against removal. *Wagner v. Amor 17 Corp.*, 321 F.Supp.2d 1195, 1201 (D. Nev. 2004). In the absence of diversity jurisdiction, removal under 28 U.S.C. §1441(a) is only proper if there is a federal question providing the federal courts with original jurisdiction as outlined in 28 U.S.C. §1331. *Id.* Determinations of federal jurisdiction require considerations of the "congressional intent, judicial power, and the federal system." *Id.* at 1202 (internal citation omitted). Accordingly, federal question jurisdiction is "continuously construed and limited in light of the history that produced it, the demands of reason and coherence, and the dictates of sound judicial policy." *Id.* (Internal citations omitted).

"[R]emand must be granted unless the defendant can show that there is no possibility that the plaintiff could prevail on any cause of action it brought against the non-diverse defendant." *Gerber v. Bayer*, 2008 U.S. Dist. Lexis 12174 (Case No. 07-05918, N.D. Cal. 2008) see also *Levine v. Allmerica Financial Life Ins. & Annuity Co.*, 41 F. Supp. 2d 1077, 1078 (C.D. Cal. 1999).

///

///

///

- 6 -

## A. REMOVAL IS IMPROPER AS PLAINTIFFS ONLY ALLEGE STATE LAW CLAIMS FOR RELIEF

As stated *supra*, the Supreme Court has repeatedly "declined to construe federal jurisdictional statutes more expansively than their language, most fairly read, requires." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Manning*, 136 S.Ct. 1562, 1573 (2016). The federal court to which a case is removed must reject jurisdiction if there is any doubt as to whether the defendant had the right to remove the action. *Gaus*, 980 F.2d at 566. Federal courts have a long tradition of recognizing the independence of the state courts to determine the cases brought therein, which includes a "reluctance . . . to expand the jurisdiction of federal courts through a broad reading of jurisdictional statutes." *Merrill Lynch*, 136 S. Ct. at 1573 (quoting *Romero v. International Terminal Operating Co.*, 358 U.S. 354, 379 (1959)).

The court's reluctance to expand the jurisdiction of the federal courts is even greater in cases involving exclusive federal jurisdiction. *Id.* This is especially true "when, as here, the construction offered would place in federal court actions bringing only claims created by state law – even if those claims might raise federal issues." *Id.* at 1573-1574. The fact that the complaint makes reference to a federal duty is not sufficient to support removal of a case asserting all state-law claims. *Id.* at 1574.

In *Merrill Lynch*, the Court conducted an analysis of whether Section 27 of the Exchange Act required removal because it granted district courts exclusive jurisdiction for "all suits in equity and actions at law brought to enforce any liability or duty created by [the Exchange Act] or the rules and regulations thereunder." *Id.* at 1567. The Court reasoned that the "brought to enforce" language in Section 27 carries the same meaning, and is subject to the same analysis, as statutes conferring exclusive jurisdiction for claims "arising under" the statutes. *Id.* at 1573. Thus, the Court applied the jurisdictional test for those cases "arising under" federal law as applied in cases removed under 28 U.S.C. §1331. *Id.* at 1569. There are two (2) scenarios in which a case "arises under" federal law:

> Most directly, and most often, federal jurisdiction attaches when federal law creates the cause of action asserted. That set of cases is what [plaintiff] highlights in offering his view of §27. But even when a 'claim finds its origins' in state law, there is 'a special and small category of cases in which arising under jurisdiction still lies.' *Gunn v. Minton*, 568 U.S. ___, ___, 133 S.Ct. 1059, 185 L.ed.2d 72,

79 (2013) As this Court has explained, a federal court has jurisdiction of a state-law claim if it 'necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance' of federal and state power. *Grable & Sons Metal Products, Inc. v. Darue Engineering & Mfg.*, 545 U.S. 308, 314, 125 S.Ct. 2363, 162 L.Ed.2d 257 (2005) . . . That description typically fits cases, like those described just above, in which a state-law cause of action is 'brought to enforce' a duty created by the Exchange Act because the **claim's very success depends on giving effect to a federal requirement**. *Id.* at 1569-1570 (emphasis added).

Based on the foregoing, even where a federal statute calls for exclusive jurisdiction, the defendant, on removal, must demonstrate that the complaint arises under the federal law either because it explicitly states claims under federal law or because the plaintiff cannot prove his or her claims without proving a violation of federal law. In removal cases invoking federal question jurisdiction pursuant to 28 U.S.C. §1331 (conferring original jurisdiction on federal district courts for "all civil actions arising under the Constitution, laws, or treaties of the United States"), the Courts apply the "well-pleaded complaint rule," which provides that a federal court has jurisdiction only where a federal question is "presented on the face of the plaintiff's properly pleaded complaint." *See, Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987).

In some instances a complaint reliant upon state law may still be removable for federal question jurisdiction pursuant to 28 U.S.C. §1331 due to the application of the substantial federal question doctrine. *Pinney v. Nokia, Inc.*, 402 F.3d 430, 442 (4th Cir. 2005). However, in such a case, defendants must establish two (2) elements to remove an action under the substantial federal question doctrine: "(1) that the plaintiff's right to relief necessarily depends on a question of federal law, and (2) that the question of federal law is substantial." *Id.* (citing *Dixon v. Coburg Dairy, Inc.*, 369 F.3d 811, 816 (4th Cir. 1996)). If resolution of a well-pleaded state claim depends upon the resolution of an issue of federal law, removal would be proper. *Id.* The substantial federal question doctrine does not apply if the plaintiff can establish his state law claims without resolving an issue of federal law. *Id.*

The jurisprudence regarding removal supports the well-founded principle that plaintiffs control their claims and, thus, may avoid federal jurisdiction by relying entirely upon state law in their complaints. *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987). Here, Plaintiffs' First Amended Complaint alleges the following ten (10) claims for relief against Defendants:

- 8 -

1. Negligence;

2. Negligence against MGM Resorts International;

3. Loss of Consortium;

4. Wrongful Death;

5. Premises Liability;

6. Negligent Infliction of Emotional Distress;

7. Negligence Per Se, based on alleged violations of applicable Clark County Ordinances;

8. Nuisance;

9. Negligent Hiring, Retention, and Supervision; and

10. Gross Negligence: Punitive Damages.[15]

Each of Plaintiffs' claims for relief are based entirely on state law. Plaintiffs have not alleged any claims for relief arising out of federal law. None of Plaintiffs' claims for relief require Plaintiffs to prove a violation of the SAFETY Act. The requisite strict construction of the removal statute and the SAFETY Act, compels a conclusion that removal is improper in this action. Simply put, Defendants cannot meet the threshold requirement that removal is proper under 28 U.S.C. §1441(a), and thus, remand is necessary.

## B. THE SAFETY ACT DOES NOT APPLY

The SAFETY Act permits a federal cause of action "for claims arising out of, relating to, or resulting from an act of terrorism when qualified anti-terrorism technologies have been deployed in defense against or response or recovery from such act and such claims result or may result in loss to the Seller." 6 USC §442(a)(1). However, a review of the SAFETY Act shows that it is not applicable to the case at bar, because: (1) there has been no finding that the 1 October shooting was an "act of terrorism," (2) Plaintiffs have made no claims against Contemporary Services Corporation ("CSC"), who, according to defendants allegations, is the qualified Seller under the Act involved in this event; (3) Defendants are not qualified Sellers, and as such has no standing for removal; and (4) Defendants were the proximate cause of Plaintiffs' injuries.

---

[15] *See*, First Amended Complaint, attached as Exhibit "1."

Evaluating the meaning of the SAFETY Act begins with a review of the plain language. *See, Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 450 (2002). As such, the first step is determining "whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Id.* The inquiry into a statute's meaning need not continue once the Court makes the determination that it is clear and unambiguous. *Id.*

**1. The Act does not apply because there has been no official finding that this was "an act of terrorism"**

As a threshold matter, the SAFETY Act does not apply because the Secretary of Homeland Security has not officially declared Shooter's actions an "act of terrorism." For purposes of the SAFETY Act, an act is considered an "act of terrorism" only if the *Secretary [of Homeland Security] determines* that the act (i) is unlawful; (ii) causes harm to a person, property, or entity in the United States; and (iii) uses or attempts to use instrumentalities, weapons or other methods designed or intended to cause mass destruction, injury or other loss to citizens or institutions of the United States. *See* 6 U.S.C. § 442(2)(A)-(B), 6 C.F.R. §25.2, and 48 C.F.R. § 50.201. The Secretary's power to declare an act an "act of terrorism" under the SAFETY Act is non-delegable.[16] As such, aside from the Secretary of Homeland Security, no one, including this Court, has authority to make such a determination. Because there never been an official finding that the Shooting was an "act of terrorism," the SAFETY Act does not apply.

Despite there having been no official declaration of the 1 October shooting as an act of terrorism, Defendants make a stretch and point to four (4) sources in support of its argument that the Secretary and Department of Homeland Security ("DHS")[17] have made such a determination. These sources include: (1) Congressional Testimony of Acting Secretary of DHS, November 30, 2017;[18]

---

[16] *See* 6 C.F.R. §25.3 "All of the Secretary's responsibilities, powers, and functions under the SAFETY Act, except the authority to declare that an act is an Act of Terrorism for purposes of section 865(2) of the SAFETY Act, may be exercised by the Under Secretary for Science and Technology of the Department of Homeland Security or the Under Secretary's designees." *See also* Regulations Implementing the Support Anti-Terrorism by Fostering Effective Technologies Act of 2002 (the SAFETY Act), 71 F.R. 33147.

[17] As stated above, the Secretary has sole power to declare an act an "act of terrorism" for purposes of the SAFETY Act. To the extent that Defendants argue that other DHS officials have power to make an official finding, they are simply not correct.

[18] https://www.dhs.gov/news/2017/11/30/written-testimony-dhs-acting-secretary-elaine-duke-house-committee-homeland-security (distinguishing between "terrorists and other violent criminals" and noting that both terrorists and other violent criminals are placing significant emphasis on attacking soft targets (*e.g.*, sports venues, shopping venues,

- 10 -

MOTION FOR REMAND

(2) Department of Homeland Security, Soft Targets and Crowded Places Security Plan Overview, May 2018;[19] (3) Congressional Testimony of Secretary of DHS, May 15, 2018;[20] and (4) June 4, 2018 DHS announcement regarding the development of a ST-CP Security Enhancement and Coordination Plan.[21] *See* Dkt. 1 at p. 3. Relying solely on four (4) sources, three (3) of which do not even mention the Shooting and none of which contain a determination by the Secretary that the Shooting was in fact an "act of terrorism," Defendants would have this Court believe that any attack on a soft target or crowded place constitutes an "act of terrorism" such that the SAFETY Act applies. This is simply not true and no court has ever so held. Moreover, Defendants admit, by declaration of its counsel, that CSC only recently began the process of obtaining a statement certifying the Shooting as an "act of terrorism."[22] Simply put, unless and until the Secretary of Homeland Security makes an official finding that the Shooting was an "act of terrorism," any argument by Defendants that the SAFETY Act applies in this case is not only premature, but also lacks merit.[23]

## 2. Plaintiffs Have Not Made Claims Against CSC

The SAFETY Act creates an exclusive "[f]ederal cause of action [that] shall be brought only for claims for injuries that are proximately caused by **Sellers** that provide qualified anti-terrorism technology [QATT] to...customers."[24] A "Seller" for purposes of the SAFETY Act is the "person or entity that sells or otherwise provides a qualified anti-terrorism technology to . . . customers."[25] In this case, CSC is the only entity potentially entitled to protection under the SAFETY Act.[26]

---

schools, and transportation systems), such as those seen in "recent *tragedies* in Nevada [the October 1, 2017 Shooting], New York [the October 31, 2017 attack in which eight people were run over by a driver inspired by the terrorist group ISIS], and Texas [the November 5, 2017 shooting in which a gunman opened fire in a rural Texas church].
[19] https://www.dhs.gov/sites/default/files/publications/DHS-Soft-Target-Crowded-Place-Security-Plan-Overview-052018-508_0.pdf. Although comprehensive in nature, the publication acknowledges that soft targets and crowded places are targeted by several types of bad actors, including foreign terrorist organizations, foreign fighters, and other threat actors, such as domestic criminals and lone actors. There is no mention of Shooter or the Shooting.
[20] https://www.dhs.gov/news/2018/05/15/written-testimony-dhs-secretary-nielsen-senate-committee-homeland-security-and. This Testimony does not mention Shooter, the Shooting, or the SAFETY Act.
[21] https://www.dhs.gov/publication/securing-soft-targets-and-crowded-spaces. Again, this Publication does not mention Shooter, the Shooting, or the SAFETY Act.
[22] *See*, Declaration of Michael R. Doyen, Doc. 1-15 on file herein, at ¶ 4.
[23] Even if the Shooting is certified by DHS as an "act of terrorism," Plaintiffs maintain that the SAFETY Act does not apply to this case for the reasons stated throughout this Motion to Remand.
[24] 6 U.S.C. §442 (a)(1) (emphasis added).
[25] 6 U.S.C. §443(a)(1); *see also*, 6 C.F.R. §25.2.
[26] Plaintiffs acknowledge that DHS issued a Certificate of Conformance to CSC for its Event Security Services in accordance with the SAFETY Act, on April 20, 2017. However, as discussed above, Plaintiffs have not asserted any claims against CSC.

- 11 -

However, Plaintiffs have not asserted any claims against CSC nor have they alleged that the performance or non-performance of CSC's QATTs proximately caused their injuries. The named Defendants in this action are Mandalay Bay, LLC fka Mandalay Corp., Mandalay Resort Group, MGM Resorts Festival Grounds, LLC, MGM Resorts Venue Management, LLC, and MGM Resorts International.[27] CSC is neither named as a defendant, nor is it referenced anywhere in Plaintiffs' First Amended Complaint.

Congress has made it clear that the Seller [CSC] is the only appropriate defendant in an action alleging a violation of the SAFETY Act.[28] The Code of Federal Regulations specifically states that a cause of action for the failure of a QATT system "may not be brought against the buyers, buyers' contractors, downstream users of the [QATT], the Seller's suppliers or contractors, or any other person or entity."[29] Looking to the Congressional Record dated November 19, 2002, Senator Hatch made a clear statement regarding the purpose of the SAFETY Act, "[to] facilitate the development and deployment of needed technologies, the House included its SAFETY Act provision, recognizing that we cannot saddle manufacturers with unreasonable exposure to unlimited lawsuits."[30] There can be [o]nly one cause of action . . . for . . . personal injury, or death for

---

[27] *See*, Exhibit "1."

[28] *See* 6 C.F.R. §25.7(d) ("There shall exist only one cause of action for...person injury, or death for performance or non-performance of the Seller's Qualified Anti-Terrorism Technology in relation to an Act of Terrorism. Such cause of action may be brought only against the Seller of the Qualified Anti-Terrorism Technology and may not be brought against the buyers, the buyers' contractors, or downstream users of the Technology, the Seller's suppliers or contractors, or any other person or entity." *See also* Regulations Implementing the Support Anti-Terrorism by Fostering Effective Technologies Act of 2002 (the SAFETY Act), 71 F.R. 33147 (noting that a Seller is the only appropriate defendant in a claim brought under the SAFETY Act and explaining that if this were not the case, a would-be-plaintiff could, in an effort to circumvent the statute, bring claims (arising out of or relating to the performance or non-performance of the Seller's Qualified Anti-Terrorism Technology) against arguably less culpable persons or entities, including but not limited to contractors, subcontractors, suppliers, vendors, and customers of the Seller of the technology, which would in turn lead those persons or entities to file a third-party action against the Seller. As discussed in greater detail below, Plaintiffs have not alleged that the performance or non-performance of CSC's QATTs proximately caused their injuries. Therefore, any argument that Plaintiffs are attempting to circumvent the statute by bringing claims against Defendants as opposed to CSC fails.

[29] *Id.*

[30] 148 Cong. Rec. S11367 (2002) (statement of Sen. Orrin Hatch). Plaintiffs maintain that the language of the SAFETY Act is clear and it is not necessary to look beyond the plain language to determine its meaning and application, but provide this statement from the Congressional record of further support for the clear and unambiguous meaning of the SAFETY Act.

MOTION FOR REMAND

performance or non-performance of the" QATT and the only appropriate defendant in that cause of action is the Seller.[31]

There is no question that the SAFETY Act only applies to claims against a Seller for personal injuries or deaths caused by the performance or non-performance of the QATT at issue. Since Plaintiffs have not asserted any claims against CSC, who is the only entity that would possibly qualify as a Seller, the SAFETY Act does not apply to this case.

### 3. Defendants Have no Standing for Removal Since It is Not a "Seller" of Qualified Anti-Terrorism Technology

Defendants are not entitled to protection under the SAFETY Act because it is not a "Seller" of qualified anti-terrorism technology.[32] A "Seller" is any person, firm, or other entity that sells or otherwise provides Qualified Anti-Terrorism Technology to any customer(s) and to whom or to which (as appropriate) a Designation and/or Certification has been issued under this Part."[33] Here, unlike CSC, Defendants are not Sellers because they do not sell or provide QATTs to customers. Further, Defendants have not received a Designation or Certification from the DHS under the SAFETY Act. Therefore, because Defendants are not Sellers, they do not have standing for removal.

Moreover, Defendants are not intended beneficiaries of the limitations and protections contained within the SAFETY Act. In the context of contractual relations, a party may be a third-party beneficiary to a contract if the "contract reflects the express or implied intention of the parties to benefit the third-party." *Rogers v. United States Army*, 2007 U.S. Dist. LEXIS 30056, *36 (S.D. Tex. April 23, 2007) (citing *State of Montana v. United States*, 124 F.3d 1269, 1273 (Fed. Cir. 1997). The "intent-to-benefit" is generally determined upon review of the contractual relationship and consideration of "whether the beneficiary would be reasonable in relying on the promise as intending to confer a right on him." *Id.* at *37. Contract law requires clear language in the contract that the parties thereto intended to confer a benefit on a third-party. *InterGen N.V. v. Grina*, 344 F.3d

---

[31] Regulations Implementing the Support Anti-terrorism by Fostering Effective Technologies Act of 2002 (the SAFETY Act), 71 Fed. Reg. 110 (June 8, 2006), 33150.

[32] Notably, Defendants have not taken the position that it is a Seller for purposes of the SAFETY Act. However, out of an abundance of caution, Plaintiffs have addressed this argument as further support of their argument that this case should be remanded to state court.

[33] 6 C.F.R. §25.2.

- 13 -

MOTION FOR REMAND

134, 146 (1st Cir. 2003). A contract that specifically outlines the parties thereto and their rights without mention of any rights conferred on a third-party cannot later be found to benefit a third party. *Id.*

It is reasonable to apply a similar analysis of examining the clear language when determining who is entitled to protections under any statute, including the SAFETY Act. If a company happens to receive the benefit of a QATT product or system, it is not immediately entitled to the protections afforded under the Act. There is no evidence here that Defendants relied upon any protections of the SAFETY Act in allowing CSC to provide security at the Route 91 Festival or that Defendants had anything to do with the decision to utilize CSC's services. In fact, the Declaration submitted in support of the Notice of Removal indicates that Defendants were not aware of the SAFETY Act or its protections until after it was served with the First Amended Complaint.[34]

Defendants' attempts to avail themselves of the protections of the SAFETY Act is not supported by the language of the SAFETY Act or under the law of statutory construction. Thus, remand to State Court is appropriate.

### 4. Neither CSC nor the QATT System were the Proximate Cause of the Shooting

Pursuant to the SAFETY Act, a cause of action "shall be brought only for claims for injuries that are **proximately caused by sellers** that provide qualified anti-terrorism technology to Federal and non-Federal government customers."[35] Black's Law Dictionary defines proximate cause as follows: "1. A cause that is legally sufficient to result in liability. 2. A cause that directly produces an event and without which the event would not have occurred."[36] As set forth in Plaintiffs' First Amended Complaint, the failures of the security within the Mandalay Bay Resort was the proximate cause of the shooting event.[37] Stated another way, but for the failures of the Mandalay Bay Resort security, the Shooter would not have been able to carry out his attack and Plaintiffs would not have suffered any injuries. The actions, or inactions, of CSC have no impact on whether the shooting occurred. As such, Plaintiffs have not alleged that the performance or non-performance of CSC's

---

[34] *See,* Declaration of Michael R. Doyen, Document 1-15, at ¶¶ 4-8.
[35] 6 U.S.C. §442(a)(1)(emphasis added).
[36] *Proximate Cause,* Black's Law Dictionary (8th ed. 2006).
[37] *See,* Exhibit "1."

Qualified Anti-Terrorism Technology caused the shooting that caused Plaintiffs' injuries. Once again, the plain language of the SAFETY Act shows that it does not apply.

The only circumstance in which the SAFETY Act may apply is if Plaintiffs had asserted claims against CSC or, alternatively, if Plaintiffs had alleged that their injuries were proximately caused by the performance or non-performance of CSC's Qualified Anti-Terrorism Technology (QATTs). Here, Plaintiffs have enumerated numerous acts and omissions by Defendants, which proximately caused Plaintiffs' injuries. However, Plaintiffs have not alleged that CSC played any role in causing the Shooting because CSC did not provide any security services within the Mandalay Bay Resort. Additionally, Plaintiffs have not alleged that CSC's acts or omissions proximately caused their injuries. Further, Plaintiffs have not alleged that the performance or non-performance of CSC's QATTs proximately caused their injuries. As such, the SAFETY Act does not apply to this case.

## C. DEFENDANTS HAVE NOT MET THEIR BURDEN OF PROOF

In the Ninth Circuit, "the defendant always has the burden of establishing that removal is proper." *Gaus v. Miles, Inc.*, 980 F.2d 564, 566 (9th Cir. 1992). In order to meet that burden, Defendants must produce admissible evidence. A removing party "may submit evidence outside the complaint, including affidavits or declarations, or other 'summary-judgment-type' evidence relevant to the" issue on removal. *Ibarra v. Manheim Invs., Inc.*, 775 F.3d 1193, 1197 (9th Cir. 2014) (quoting *Singer v. State Farm Mut. Auto. Ins. Co.*, 116 F.3d 373,377 (9th Cir. 1997). Importantly, "a defendant cannot establish removal jurisdiction by **mere speculation and conjecture, with unreasonable assumptions**." *Id.* (emphasis added).

Here, the only evidence submitted by Defendants in support of their Notice of Removal is the Declaration of Michael R. Doyen, an attorney representing Defendants in this matter, which fails to meet any applicable standard to support removal in this case.[38] Defendants' purpose for submitting the Declaration appears to be to authenticate the Certificate of Conformance issued by the Department of Homeland Security to CSC, attached as Exhibit A thereto.[39] Mr. Doyen does not have

---

[38] *See*, Doc. 1-15.
[39] *Id.*

personal knowledge regarding CSC's certification from DHS, as he only received the certificate after learning that CSC was allegedly seeking to have the Shooting deemed an "act of terrorism."[40]

Neither the Notice of Removal nor the Declaration provide any evidence that Defendants (or any identified person or entity) contracted with a certified QATT Seller. In fact, the Notice of Removal appears to deliberately omit the identity of the party that allegedly retained CSC to provide security for the Route 91 Festival.[41] Defendants simply state, "CSC was retained as the 'Security Vendor' for the Route 91 Harvest Festival, and provided the security personnel for the concert."[42] The Declaration is silent as to the identity of the entity that allegedly retained CSC.[43]

Moreover, Defendants have not provided any evidence that the services for which CSC may have been certified were actually deployed at the Route 91 Festival. Instead, Defendants assume that the unidentified entity that retained CSC did so with the intent that CSC would deploy the QATT for which it may have been certified.[44] Once again, the Declaration of Michael R. Doyen is silent as to whether CSC's QATT was deployed at the Route 91 Festival.

Also, Defendants have not attached the contract between CSC and the unnamed entity who allegedly entered the contract with them. The terms of that contract would be crucial to even a beginning analysis of the potential applicability of the SAFETY Act.

As set forth *supra*, the 1 October Shooting has not been designated an "act of terrorism." Defendants do not have the authority to make such a designation and cannot simply deem something an "act of terrorism" because Defendants believe they fit that definition. There is a procedure in place for designating an "act of terrorism." The authority to do so rests with the Department of Homeland Security. Without evidence that the Shooting was an "act of terrorism," the SAFETY Act does not apply.

Finally, Defendants' Declaration in support of their removal contains counsel's conclusory statements and assumptions regarding the application of the SAFETY Act. Mr. Doyen states that

---

[40] *Id.* at ¶ 4.
[41] *See*, Notice of Removal by Defendants, Doc. 1, at ¶ 11.
[42] *Id.*
[43] *See*, Doc. 1-15.
[44] *See*, Notice of Removal by Defendants, Doc. 1, at ¶11.

MOTION FOR REMAND

there has not been litigation under the SAFETY Act and that "no one has previously sought a public statement from the Secretary of Homeland Security that a particular event meets the requirements of the SAFETY Act."[45] His Declaration goes on to allege that the Shooting "appears to have been the first act of mass violence at an event at which a DHS Certified service or technology was employed."[46] Lastly, the Declaration includes counsel's conclusion, after he conducted his "over the past week," that the Shooting meets the requirements of the SAFETY Act.[47]

As set forth herein, there are multiple reasons why the SAFETY Act does not apply to this case. Defendants have failed to provide any admissible evidence that would support removal of this action under the SAFETY Act. The assumptions and conclusions of counsel for Defendants do not satisfy Defendants' burden of proof that is required to properly remove this case to Federal Court. Accordingly, removal is improper and remand is necessary.

## IV. CONCLUSION

Plaintiffs respectfully requests that this Court find that the SAFETY Act has no applicability here, and grants Plaintiffs' Motion for Remand.

Dated: June 29th, 2018

Robert T. Eglet, Esq.
Robert M. Adams, Esq.
Cassandra S.M. Cummings, Esq.
**EGLET PRINCE**

Mark P. Robinson, Jr., Esq.
Daniel S. Robinson, Esq.
**ROBINSON CALCAGNIE, INC.**

Kevin R. Boyle, Esq.
Rahul Ravipudi, Esq.
**PANISH SHEA & BOYLE LLP**

*Attorneys for Plaintiff*

---

[45] *See*, Doc. 1-15, at ¶ 7.
[46] *Id.*
[47] *Id.*

- 17 -

**CERTIFICATE OF SERVICE**

Pursuant to F.R.C.P. 5(b), I hereby certify that I am an employee of EGLET PRINCE, and on the 29th day of June, 2017, I did cause a true and correct copy of the foregoing document **PLAINTIFFS' MOTION TO REMAND** to be filed and served electronically via the Court's CM/ECF system.

_____
An employee of EGLET PRINCE

- 18 -

MOTION FOR REMAND

Case 2:18-cv-05564-JAK-FFM Document 34-2 Filed 07/10/18 Page 19 of 78 Page ID
Case 2:20-cv-01120-RMB-VCF Document 51-2 Filed 06/29/18 Page 1 of 60
#:440

# EXHIBIT 1

Plaintiffs' First Amended Complaint &
Demand for Jury Trial

Case 2:18-cv-05564-JAK-FRB Document 34-2 Filed 07/10/18 Page 20 of 78 Page ID
Case 2:18-cv-01120-RFB-VCF Document 5 Filed 06/29/18 Page 2 of 60 age
#:441

Electronically Filed
6/4/2018 3:27 PM
Steven D. Grierson
CLERK OF THE COURT

| | |
|---|---|
| **ACOM** | |
| Mark P. Robinson, Jr. | Robert T. Eglet |
| California Bar No. 54426 | Nevada Bar No. 3402 |
| (*Nevada pro hac pending*) | Robert M. Adams |
| Daniel S. Robinson | Nevada Bar No. 6551 |
| California Bar No. 244245 | **EGLET PRINCE** |
| (*Nevada pro hac pending*) | 400 S. Seventh St., Suite 400 |
| **ROBINSON CALCAGNIE, INC.** | Las Vegas, NV 89101 |
| 19 Corporate Plaza Drive | (702) 450-5400; Fax: (702) 450-5451 |
| Newport Beach, CA 92660 | eservice@egletlaw.com |
| (949) 720-1288; Fax (949) 720-1292 | *Attorneys for Plaintiffs Jovanna and Frank* |
| mrobinson@robinsonfirm.com | *Calzadillas* |
| Richard K. Hy | |
| Nevada Bar No. 12406 | [Additional Counsel On Signature Page] |
| (*Nevada local counsel*) | |
| **EGLET PRINCE** | Kevin R. Boyle |
| 400 S. Seventh St., Suite 400 | (*Nevada pro hac pending*) |
| Las Vegas, NV 89101 | California Bar No. 192718 |
| (702) 450-5400; Fax: (702) 450-5451 | Rahul Ravipudi |
| *Attorneys for Plaintiffs Rachel Sheppard;* | Nevada Bar No. 14750 |
| *Stephanie Fraser; Lotus Herrera as* | Gregorio V. Silva |
| *Special Administrator of the Estate of* | Nevada Bar No. 13583 |
| *Brian Fraser; Stephanie Fraser, as the* | Ellin Mardirosian |
| *Guardian Ad Litem for Aubree Fraser and* | Nevada Bar No. 14399 |
| *Brayden Fraser* | **PANISH SHEA & BOYLE LLP** |
| | 8816 Spanish Ridge Avenue |
| [Additional Counsel On Signature Page] | Las Vegas, NV 89148 |
| | (702) 560-5520; Fax: (702) 975-2515 |
| | boyle@psblaw.com |
| | *Attorneys for Plaintiffs Nicholas and* |
| | *Anthony Robone* |

## DISTRICT COURT

## CLARK COUNTY, NEVADA

| | |
|---|---|
| RACHEL SHEPPARD an Individual, LOTUS HERRERA an Individual and as Special Administrator of the Estate of BRIAN FRASER, decedent; STEPHANIE FRASER as the Guardian Ad Litem for AUBREE FRASER, a minor; STEPHANIE FRASER as the Guardian Ad Litem for BRAYDEN FRASER; JOVANNA CALZADILLAS an Individual, FRANCISCO CALZADILLAS an Individual; NICHOLAS ROBONE an Individual; ANTHONY ROBONE an Individual; | CASE NO.: A-18-769752-C DEPT. NO.: XXIV <br><br> **FIRST AMENDED COMPLAINT & DEMAND FOR JURY TRIAL** <br><br> Exemption from Arbitration Requested Wrongful Death |

- 1 -

**FIRST AMENDED COMPLAINT**

Plaintiffs,

vs.

MANDALAY BAY, LLC, f/k/a MANDALAY CORP., a Nevada Domestic Limited-Liability Company; MANDALAY RESORT GROUP, a Nevada Corporation; MGM RESORTS FESTIVAL GROUNDS, LLC, a Nevada Domestic Limited-Liability Company; MGM RESORTS VENUE MANAGEMENT, LLC, a Nevada Domestic Limited-Liability Company; MGM RESORTS INTERNATIONAL, a Delaware Corporation; DOES/ROES 1 through 100

Defendants.

## COMPLAINT

COME NOW Plaintiffs Rachel Sheppard, Stephanie Fraser, individually and as the Guardian Ad Litem for Aubree Fraser, a minor, and Brayden Fraser, a minor, Lotus Herrera as Special Administrator of the Estate of Brian Fraser, deceased, by and through their attorneys, Mark P. Robinson, Jr., Esq., of the law firm ROBINSON CALCAGNIE, INC., and James Lee, Esq., of the LEE MURPHY LAW FIRM; Jovanna Calzadillas and Francisco Calzadillas by and through their attorneys, Robert T. Eglet, Esq. and Robert M. Adams, Esq., of the law firm EGLET PRINCE and Patrick McGroder III, of the law firm GALLAGHER & KENNEDY; and Plaintiffs Nicholas Robone and Anthony Robone, by and through their attorneys, Kevin R. Boyle, Esq., Rahul Ravipudi, Esq., Gregorio V. Silva, Esq. and Ellin Mardirosian, Esq., of the law firm PANISH SHEA & BOYLE LLP (collectively, "Plaintiffs") bring this action against Defendants Mandalay Bay, LLC f/k/a Mandalay Corp., Mandalay Resort Group, MGM Resorts Festival Grounds, LLC, MGM Resorts Venue Management, LLC, MGM Resorts International, and Does/Roes 1-100 (hereinafter collectively, "MGM"), with personal knowledge as to their own actions, and upon information and belief as to those of others, and respectfully allege the following:

## NATURE OF THE ACTION

1. Columbine. Aurora. Sandy Hook. San Bernardino. Sutherland Springs. Pulse. Mass shootings are now a common occurrence in everyday life. They indiscriminately take place

- 2 -

**FIRST AMENDED COMPLAINT**

at schools, movie theaters, places of worship, work, nightclubs, and concerts. It is not a matter of "if," but rather "when" the next mass shooting takes place.

2.    This action seeks to redress MGM's inadequate, unreasonable, and egregiously deficient security, which resulted in an MGM VIP Guest ("Shooter") orchestrating the deadliest mass shooting in United States history, causing injuries to Plaintiffs attending an MGM promoted event held on MGM premises ("Mass Shooting").

3.    Specifically, MGM's negligence caused:

    a.   Rachel Sheppard to be shot three times by the Shooter—once in the upper chest, once in the torso, and once in the abdomen—causing her to nearly bleed to death and requiring four surgeries;

    b.   Brian Fraser to be shot in the chest while trying to escape from the Shooter, ultimately causing his death. Brian Fraser is survived by his two children, Aubree and Brayden Fraser, and his wife, Stephanie Fraser, who was next to her husband, Brian Fraser, during the shooting, causing her to suffer severe emotional distress, among other injuries;

    c.   Jovanna Calzadillas to be shot in the head—as her husband, Francisco Calzadillas, shielded her from the gunfire—causing paralysis and permanent brain damage; and

    d.   Nicholas Robone to be shot in the upper chest causing him to cough blood—which his brother Anthony Robone witnessed—requiring surgery and weeks of physical therapy.

4.    For three to six days prior to the Mass Shooting, MGM conveyed certain privileges to the Shooter, including use of a service elevator not intended to be accessible to guests or the public, which the Shooter used, with the assistance of MGM employees, to carry approximately 24 suitcases and/or bags and a large white container carrying at least 23 guns, including 22 assault rifles, to two adjacent suites on the 32nd floor of the Mandalay Bay Resort and Casino Las Vegas located at 3950 South Las Vegas Boulevard, Las Vegas, NV 89119 ("Mandalay Bay").

- 3 -

**FIRST AMENDED COMPLAINT**

5. Despite having repeated interactions with the Shooter, not a single MGM staff member, manager, or security team member inquired with the Shooter about the nearly 25 bags and containers he brought with him, even though he apparently remained alone his entire stay.

6. During those three to six days, while the Shooter prepared for the Mass Shooting, MGM failed to exercise due care for the safety of its guests, deliberately ignoring countless signs of suspicion that, if noticed, would have prevented, or significantly thwarted, the Shooter's efforts.

7. In addition to the suspiciously large number of bags the Shooter had, he carried his guns through hotel passages openly available to Mandalay Bay patrons, and he specifically requested two rooms overlooking the Route 91 Harvest Festival ("Route 91 Festival"). The Shooter procured a second room, using his girlfriend's name, despite being alone his entire stay. He also installed an elaborate surveillance system in the hotel, installing two cameras in the hallway outside of his suites and one in the peep hole on his door.

8. The Shooter also used power tools to barricade an entrance in the hallway, and he refused to allow anyone to service his room without his supervision. He also left a "Do Not Disturb" sign on his room for more than 36 hours without investigation by any MGM personnel.

9. For up to twenty minutes, the Shooter broke out the windows in his rooms and used an arsenal of weapons to reign gun fire on persons in attendance of the Route 91 Festival, a three-day country music festival promoted by and held on MGM premises, which Plaintiffs attended.

10. During the Mass Shooting, MGM gave no assistance, direction, or information to Plaintiffs, or any of the other 20,000 (approximately) festival goers, about the existence or the location of the Shooter, and how to escape to safety.

11. Instead, the Route 91 Festival attendees were trapped inside the festival venue, preventing Plaintiffs and thousands of others from escaping the gun fire. For instance, many of the festival's exits were either closed, blocked off, or completely barricaded by MGM, and the few available exits were not well marked or lit.

12. Even worse, MGM had immediate, actual knowledge of the location of the Shooter and that hundreds of rounds were being fired from his suite to the Route 91 Festival. Still, MGM failed to take any action to stop or deter the Shooter, and failed to accurately provide law enforcement with the Shooter's location.

- 4 -

**FIRST AMENDED COMPLAINT**

1    13.    As a result of MGM wrongful conduct, acts, and omissions, 58 people in attendance

2    perished, including Brian Fraser, and thousands more were injured, including Rachel Sheppard,

3    Stephanie Fraser, Jovanna Calzadillas, Francisco Calzadillas, Nicholas Robone and Anthony

4    Robone.

5                                          **PARTIES**

6    **Plaintiff Rachel Sheppard**

7    14.    Plaintiff Rachel Sheppard is and at all times relevant hereto was a resident of the

8    State of California.

9    15.    Rachel Sheppard purchased a ticket to the Route 91 Festival, and at all relevant

10   times was a paying customer of MGM.

11   16.    During her stay in Las Vegas for the Route 91 Festival, Rachel Sheppard was a

12   paying customer of Excalibur Hotel and Casino ("Excalibur"), a hotel owned and operated by

     MGM.

13   17.    As a result of MGM's wrongful conduct, acts, and omissions, Rachel Sheppard was

14   shot three times by the Shooter—once in the upper chest, once in the torso, and once in the

15   abdomen—blasting her to the ground, injuring her back, and severing her aorta. She nearly bled

16   to death three times, requiring 40 units of blood, coded twice, and to date has undergone four

17   surgeries, including one where she was opened from her pubic bone to her throat in order for her

18   chest to be sawed open so that her aorta could be repaired.

19   **Plaintiffs Stephanie Fraser, Brian Fraser, Aubree Fraser, and Brayden Fraser**

20   18.    Plaintiff Stephanie Fraser brings this case on behalf of her family and individually.

21   Lotus Herrera as Special Administrator of the Estate of Brian Fraser, deceased; Stephanie Fraser,

22   as the Guardian Ad Litem for Aubree Fraser, a minor; and Stephanie Fraser, as the Guardian Ad

23   Litem for Brayden Fraser, a minor, is and at all times relevant hereto was a resident of the State of

24   California.

25   19.    Brian Fraser, decedent, was at all times hereto a resident of the State of California.

26   Stephanie Fraser, surviving spouse; Aubree Fraser, child; and Brayden Fraser, child, of Brian

27   Fraser are the only heirs to Brian Fraser as defined in N.R.S. 41.085.

28

                                          - 5 -

                              **FIRST AMENDED COMPLAINT**

20. Brian and Stephanie Fraser ("Frasers") purchased tickets to the Route 91 Festival, and at all relevant times were paying customers of MGM.



21. During their stay in Las Vegas for the Route 91 Festival, the Frasers were paying customers of Mandalay Bay. The Frasers went to Las Vegas with a large group of family and friends who spent time together at the Mandalay Bay swimming pool and at the casino floor where they discussed the Route 91 Festival with MGM's employees. During Brian Fraser's stay, MGM provided him with an M-Life players card.



22. As a result of MGM's wrongful conduct, acts, and omissions, Brian Fraser was shot in the chest by the Shooter, injuries from which he suffered for an appreciable amount of time but which ultimately caused his death.

23. As a result of MGM's wrongful conduct, acts, and omissions, Stephanie Fraser witnessed her husband, Brian Fraser, be shot, fall to the ground, and be given CPR, causing her severe emotional distress, among other injuries.

- 6 -

**FIRST AMENDED COMPLAINT**

**Plaintiff Jovanna Calzadillas, and Francisco Calzadillas**

24. Plaintiff Jovanna Calzadillas is and at all relevant times hereto was a resident of the State of Arizona.

25. Plaintiff Francisco Calzadillas is and at all relevant times hereto was a resident of the State of Arizona.

26. Jovanna and Francisco Calzadillas ("Calzadillas") purchased tickets to the Route 91 Festival, and at all relevant times were paying customers of Defendants.

27. During their stay in Las Vegas for the Route 91 Festival, the Calzadillas were paying customers of the Luxor Hotel and Casino, an MGM property, and were members of MGM's M-Life rewards program. Francisco Calzadillas recently returned from military deployment and he was vacationing with his wife in Las Vegas.

28. As a result of Defendants' wrongful conduct, acts, and omissions, Jovanna Calzadillas was shot in the head by the Shooter, causing paralysis and permanent disability. As a result of Defendants' wrongful conduct, acts, and omissions, Francisco Calzadillas witnessed his wife, Jovanna Calzadillas, be shot, and he carried her lifeless body out of the concert venue causing him severe emotional distress.

**Plaintiff Nicholas Robone and Anthony Robone**

29. Plaintiff Nicholas Robone is and at all relevant times hereto was a resident of Clark County, Nevada.

30. Plaintiff Anthony Robone is and at all relevant times hereto was a resident of Clark County, Nevada.

31. Nicholas Robone and his brother Anthony Robone purchased or received as gifts tickets to the Route 91 Festival, and at all relevant times were paying customers of MGM.

32. As a result of Defendants' wrongful conduct, acts, and omissions, Nicholas Robone suffered a gunshot wound to his upper chest, the bullet just missing his heart, but bruising his lungs, requiring weeks of physical therapy and medical treatment.

33. As a result of Defendants' wrongful conduct, acts, and omissions, Anthony Robone witnessed his brother, Nicholas Robone, be shot, and Anthony Robone carried his brother's

- 7 -

**FIRST AMENDED COMPLAINT**

bleeding body out of the concert venue causing him severe emotional distress, among other injuries.

**Defendant Mandalay Bay, LLC f/k/a Mandalay Corp.**

34. At all relevant times, Defendant Mandalay Bay, LLC f/k/a Mandalay Corp. was a Nevada Domestic Limited-Liability Company duly licensed and incorporated under the laws of Nevada, with its principal place of business in Clark County, Nevada, and, as a subsidiary of Defendant MGM Resorts International, is believed to be the owner, operator, lessor, and/or manager of Mandalay Bay. Mandalay Bay, LLC had its own VIP section inside the Las Vegas Village.

**Defendant Mandalay Resort Group**

35. At all relevant times, Defendant Mandalay Resort Group was a Nevada Domestic Corporation duly licensed and incorporated under the laws of Nevada, with its principal place of business in Clark County, Nevada, and is the managing member of Mandalay Bay, LLC, and, as a subsidiary of Defendant MGM Resorts International, is believed to be the owner, operator, lessor, and/or manager of Mandalay Bay. In addition, Mandalay Resort Group owns and/or operates multiple hotels under its umbrella including, but not limited to:

    a. Victoria Partners, dba Monte Carlo Resort and Casino ("Monte Carlo");

    b. Circus Circus Casinos, Inc., dba Circus Circus Hotel and Casino Las Vegas ("Circus Circus");

    c. Ramparts, Inc., dba Luxor Hotel and Casino ("Luxor");

    d. New Castle Corp., dba Excalibur Hotel and Casino ("Excalibur"); and

    e. Mandalay Bay LLC dba Mandalay Bay Resort and Casino and the Delano f/k/a THEHotel ("Mandalay Bay").

**Defendant MGM Resorts Festival Grounds, LLC**

36. At all relevant times, Defendant MGM Resorts Festival Grounds, LLC, was a domestic limited-liability company duly licensed and incorporated under the laws of Nevada, with its principal place of business in Clark County, Nevada, and is believed to be the owner and/or operator of the Las Vegas Village, the concert venue where the Route 91 Festival occurred in September and October 2017.

- 8 -

**FIRST AMENDED COMPLAINT**

**Defendant MGM Resorts Venue Management, LLC**

37. At all relevant times, Defendant MGM Resorts Venue Management, LLC was a domestic limited-liability company duly licensed and incorporated under the laws of Nevada, and believed to be the concert and/or event promoter of the Route 91 Festival in September and October 2017.

**Defendant MGM Resorts International**

38. At all relevant times, Defendant MGM Resorts International was a corporation duly licensed and incorporated under the laws of Delaware, with its principle place of business in Clark County, Nevada, and is the parent company and alter-ego of Defendant Mandalay Bay, LLC f/k/a Mandalay Corp., Defendant Mandalay Resort Group, and Defendant MGM Resorts Festival Grounds, LLC, Defendant MGM Resorts Venue Management, LLC, and is believed to be the owner, co-owner, operator, lessor, lessee and/or manager of Excalibur and Mandalay Bay, as well as Las Vegas Village, an open-air concert and event venue adjacent to the Mandalay Bay consisting of 15 acres of seating area with a capacity of 40,000 guests located at 3901 South Las Vegas Boulevard, Las Vegas, NV 89119 ("Las Vegas Village"). MGM Resorts International had its own VIP section inside the Las Vegas Village. MGM Resorts International is also believed to be the permit holder for the Route 91 Festival, and responsible for the security at the Mandalay Bay and Las Vegas Village.

**Unknown Defendants**

39. The true names and/or capacities, whether individual, corporate, partnership, associate or otherwise, of the Defendants herein designated as Does and/or Roes are unknown to Plaintiffs at this time who, therefore, sues said Defendants by fictitious names. Plaintiffs allege that each named Defendant herein designated as Does and/or Roes is negligently, willfully, contractually, or otherwise legally responsible for the events and happenings herein referred to and proximately caused damages to Plaintiffs as herein alleged. Plaintiffs will seek leave of Court to amend this Complaint to insert the true names and capacities of such Defendants when they have been ascertained and will further seek leave to join said Defendants in these proceedings.

**FIRST AMENDED COMPLAINT**

40.     Plaintiffs are informed and believe and thereon alleges that at all times mentioned herein, Does and/or Roes were agents, servants, employees, partners, distributors or joint venturers of each other and that in doing the acts herein alleged, were acting within the course and scope of said agency, employment, partnership, or joint venture. Each and every Defendant aforesaid was acting as a principal and was negligent or grossly negligent in the selection, hiring and training of each and every other Defendant or ratified the conduct of every other Defendant as an agent, servant, employee or joint venture.

41.     Plaintiffs are informed and believe and thereon allege that Defendants Mandalay Bay, LLC f/k/a Mandalay Corp.; Mandalay Resort Group; MGM Resorts Festival Grounds, LLC; MGM Resorts Venue Management, LLC; MGM Resorts International; and Does/Roes currently unknown to Plaintiffs at this time participated in a joint venture when it organized, held, marketed, secured and/or otherwise hosted the Route 91 Festival. Defendants, as co-venturers to this business enterprise, relied on each other's unique skill and expertise in order to share in the profits from the Route 91 Festival. What neither could accomplish on its own, the Defendants could accomplish together as part of the joint venture.

**JURISDICTION AND VENUE**

42.     Exercise of the jurisdiction by this Court over each and every Defendant in this action is appropriate because each and every Defendant has done, and continues to do, business in the State of Nevada, and committed a tort in the State of Nevada.

43.     Exercise of the jurisdiction by this Court is further appropriate where all incidents described herein occurred in Clark County, Nevada.

**GENERAL ALLEGATIONS**

**A. MGM Failed to Exercise Due Care**

44.     Plaintiffs reallege and incorporate by reference every allegation contained in this Complaint as though fully set forth herein. Based on information and belief, Plaintiffs assert the additional allegations below.

45.     The Shooter was a VIP guest of Mandalay Bay, and his room charges were compensated by the hotel. The Shooter was permitted to specifically select his room—choosing

- 10 -

rooms with a vantage point from which to carry out the Mass Shooting—and to make changes to the layout of the rooms to assist with his plan.

46.     Because of his VIP status, MGM gave the Shooter extra leeway and privileges, and either relaxed or failed to enforce the inadequate security policies and procedures that it has in place for the safety of its guests.

47.     On Monday, September 25, 2017, six days before the October 1, 2017 Mass Shooting, the Shooter checked into corner suite 32-135 on the 32nd Floor of the Mandalay Bay, a suite specifically selected by the Shooter with a view overlooking the Route 91 Festival.

48.     On September 29, 2017, the Shooter, despite apparently being alone his entire stay, used his girlfriend's name to check into suite 32-134, which connected with room 32-135 via a door in between.  Both rooms had a scheduled check-out date of October 2, 2017.



49.     MGM, including the Mandalay Bay premises, has a "strict no weapons" policy.  In so doing, MGM voluntarily assumed, and continues to assume, a duty to protect its patrons by prohibiting firearms on its premises, recognizing such prohibition as being necessary for their safety. However, MGM failed to enforce this policy against the Shooter, which resulted in the Plaintiffs' damages.

50.     After checking in, MGM's employees allowed the Shooter to use a service elevator to transport numerous bags, which contained an arsenal of weapons, explosive material, and ammunition, to his room.  It is against MGM's policy, which is designed for the safety of its guests, to allow non-employees to use the service elevators or bring firearms onto hotel premises.

- 11 -

**FIRST AMENDED COMPLAINT**

51.     Specifically, based on Event # 171001-3519 LVMPD Force Investigation Team Report ("Report"), subsequent reports, and upon information and belief, not only was MGM negligent in prohibiting firearms, ammunition, and explosives to accumulate in rooms 32-135 and 32-134, but MGM's employees escorted, delivered, carried and/or helped the Shooter carry the prohibited and dangerous items to the rooms:

  a.  On September 25, 2017, at approximately 4:56 pm, the Shooter had valet at Mandalay Bay unload his vehicle and then went to the front desk with approximately **five suitcase bags**. A Mandalay Bay bellman met the Shooter who requested to use the service elevators, not the guest elevators, and escorted him to room 32-135. The Shooter rolled one bag and the bellman used a luggage cart to carry approximately four bags with firearms, assault weapons, ammunition, tripods, explosive material, and other prohibited items:



  b.  On September 26, 2017, at approximately 10:52 pm, the Shooter again valeted his vehicle at Mandalay Bay and this time had approximately **seven additional suitcase bags** removed from his vehicle and had six placed on a luggage cart and rolled one himself. Again, the Mandalay Bay bellman took the seven bags and the Shooter through the service elevator instead of the guest elevators to room 32-135:

- 12 -

**FIRST AMENDED COMPLAINT**



c.   On September 28, 2017, at approximately 9:46 pm, the Shooter valeted his vehicle and removed approximately **one white container, two rolling suitcases** and **a laptop bag**, taking the service elevator to his room:

d.   On September 30, 2017, at approximately 5:56 am, the Shooter returned to Mandalay Bay and removed approximately **four suitcase bags** from his vehicle and moved them to his room:

- 13 -

**FIRST AMENDED COMPLAINT**

Case 2:18-cv-05564-JAK-FFM Document 34-2 Filed 07/10/19 Page 33 of 78 Page ID
#:454
Case 2:18-cv-01120-RFB-VCF Document 34-2 Filed 06/29/18 Page 15 of 60

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



e.  Also on September 30, 2017, at approximately 2:52 pm, valet retrieved the
Shooter's vehicle, which the Shooter immediately moved to the self-parking
garage.  At approximately 3:12 pm, the Shooter retrieved approximately **two
more bags** from his vehicle in self-parking and utilized the guest elevator to
take the additional two bags to his room:



f.  On October 1, 2017, at approximately 12:29 pm, the Shooter transported
approximately **two additional rolling suitcases and another bag** hanging
from one of the rolling suitcases and utilized the guest elevators to take the
bags and rolling suitcases carrying prohibited items to his rooms:

- 14 -

**FIRST AMENDED COMPLAINT**



52.     MGM's employees also went into the Shooter's rooms multiple times to perform cleaning, housekeeping, and food service delivery or retrieval, where Plaintiffs believe employees either witnessed his cache of weapons, explosive materials, power tools, hammers, tripods, ammunition, and homemade gas masks, and failed to report their observations to law enforcement; or failed to recognize his cache of weapons, explosive materials, power tools, hammers, tripods, ammunition, homemade gas masks, and therefore negligently and carelessly did not report their observations to law enforcement.

53.     If the latter, MGM's employees still went into the Shooter's room and saw a single individual with more than 20 bags of luggage in his rooms, who refused to allow anyone in his rooms without his supervision, which should have triggered action on their part and on the part of any reasonable hotel employee/agent.

54.     Based on the above-mentioned Reports, and upon information and belief, MGM's employees negligently and carelessly failed to discover and/or notify law enforcement of the Shooter's wrongful, dangerous, suspicious, and potentially harmful conduct on at least the following dates and times:

        a.  On September 27, 2017, sometime after 4:00 pm, when delivering two entrees to the Shooter in room 32-135;

        b.  On September 27, 2017, at approximately 4:32 pm, when cleaning room 32-135 with the Shooter remaining in the room;

- 15 -

**FIRST AMENDED COMPLAINT**

c.  On September 29, 2017, at approximately 2:00 pm, when cleaning room 32-135 with the Shooter remaining in the room and instructing the staff not to vacuum the floor;

d.  On September 29, 2017, at approximately 11:00 pm, when delivering food to room 32-134 for the Shooter;

e.  On September 30, 2017, around noon, when servicing the mini bar in room 32-134;

f.  On September 30, 2017, shortly after noon, the Shooter placed a "Do Not Disturb" sign on the doors to rooms 32-135 and 32-134, and declined any further cleaning service; and

g.  On October 1, 2017, at approximately 1:37 pm, when delivering another meal to room 32-134, trusted hotel staff employees accessed the room and were in contact with the Shooter, the room, the luggage, the prohibited firearms, ammunition or other prohibited items, including approximately 21 assault rifles, one long rifle, one handgun, 5,000 rounds of ammunition, explosive materials, power tools, hammers, tripods, and **at least 20 bags** which carried the prohibited items, including approximately 16 bags which were previously transported and delivered by MGM's employees.

55.  Sometime between September 28, 2017 and October 1, 2017, the Shooter used power tools to bolt the stairwell door closed, which, remarkably, MGM either ignored given the Shooter's VIP status, or it went undetected until immediately prior to the Mass Shooting because of Mandalay Bay's inadequate security. And, on October 1, 2017, between 2:23 pm and 7:40 pm, the doors of rooms 32-134 and 32-135 were manipulated multiple times, which MGM detected, but ignored. For example, the doors were opened, closed, and the dead bolt locks were engaged and disengaged several times, without any investigation by MGM.

56.  During this period, the Shooter used power tools to install one camera in the peephole of his suite and at least two more cameras in the hallway, with one of the cameras on a Mandalay Bay food service cart left by the Shooter in the hallway outside his room. The Shooter

- 16 -

**FIRST AMENDED COMPLAINT**

used these video cameras to keep a lookout into on the hallway, and to attempt to thwart security and/or law enforcement:



57.    Inexplicably, MGM either intentionally ignored this surveillance system entirely given the Shooter's VIP status, or it went completely undetected until after the Mass Shooting had ended because of Mandalay Bay's inadequate security.



58.    Given the totality of the circumstances, MGM was either on notice that guests on its premises could be harmed by the Shooter, or, at a minimum, failed to enforce its "strict no weapons" policy and failed to exercise due care for the safety of its patrons or other persons on its premises that would have prevented the Mass Shooting from occurring.

**B. MGM's Negligence During the Mass Shooting**

59.    Leading up to the Route 91 Festival event, MGM actively promoted the event, including comping its patrons with free tickets to the festival and having its employees, including dealers at Mandalay Bay, promote the event to the hotel's patrons.

- 17 -

**FIRST AMENDED COMPLAINT**

Case 2:18-cv-05564-JAK-FFM Document 24-2 Filed 07/10/20 Page 27 of 78 Page ID
Case 2:18-cv-01120-RMB-VOR Document 31-1 Filed 06/29/18 Page 13 of 609e ID
#:458

60. On the Route 91 Festival website, Mandalay Bay and MGM's other hotels—with the majority of properties belonging to Mandalay Resort Group—were promoters of the event, offering exclusive hotel offers to those in attendance:

 

61. MGM also used social media to promote the Route 91 Festival, including the twitter accounts of both MGM Resorts International and Mandalay Bay:



- 18 -

**FIRST AMENDED COMPLAINT**

62. On October 1, 2017, Plaintiffs entered the Route 91 Festival, which took place at the Las Vegas Village, a recreational facility owned by MGM that is adjacent to and used or maintained in connection with MGM's Mandalay Bay, Excalibur, Delano, Luxor, and other MGM hotels. As they entered the Las Vegas Village the Plaintiffs' person and possessions were searched for weapons.

63. At approximately 8:40 p.m., a HotSOS alarm (triggered when a guest's room door is left ajar for a predetermined amount of time) was generated from room 32-129. MGM has a policy to investigate such alarms in order to ensure the safety of its guests and its guests' belongings. MGM deliberately waited until 9:11 p.m., over 30 minutes after the alarm was generated, to assign Mandalay Bay's security guard Jesus Campos to investigate room 32-129. Remarkably, Mr. Campos waited until approximately 9:47 p.m., more than one hour after the HotSOS alarm was first generated, to investigate room 32-129.

64. Plaintiffs are informed and believe and herein allege that this inexcusable delay was due to a lack of security staffing, and MGM's inadequate security policy and procedures, which forced Mr. Campos, the only security guard responsible for the 100-wing section of the Mandalay Bay at the time, to investigate four other HotSOS alarms first.

65. While on route to room 32-129 through the 100-wing stairwell, Mr. Campos noticed the stairwell entrance to the 32nd floor had been barricaded, preventing his access to the 32nd Floor. At approximately 10:00 p.m., after walking up to the 33rd floor and using a guest elevator to get to the 32nd Floor, Mr. Campos confirmed room 32-129 was secure. He then checked the entrance to the 100-wing stairwell and discovered an "L" bracket screwed into the door and frame, preventing it from being opened. Inexplicably, Mr. Campos reported this finding to the Maintenance Department instead of MGM Security.

66. Due to MGM's lack of staffing and inadequate security policies and procedures, Mr. Campos failed to immediately check the HotSOS alarm for room 32-129, which would have resulted in Mr. Campos investigating the 100-wing stairwell entrance much sooner.

67. At approximately 10:00 p.m., during the performance of Jason Aldean, the Shooter broke out two windows in his Mandalay Bay Hotel rooms, and began firing gunshots at the Route 91 Festival on the adjacent MGM owned property. Shortly after the shooting began, Mr. Campos

- 19 -

**FIRST AMENDED COMPLAINT**

1  walked down the 100-wing hallway when the Shooter fired shots at Mr. Campos, striking him in

2  the left calf with a bullet fragment. Despite Mr. Campos telling his dispatcher that shots had been

3  fired from room 32-135, MGM failed to immediately and correctly report this information to law

4  enforcement, leading to a delayed and imprecise response by law enforcement, causing and

5  contributing to the injuries and damages suffered by Plaintiffs.

6  68.   At approximately 10:10 p.m., hotel engineer, Stephen Schuck, arrived on the 32nd

7  floor to investigate the "L" bracket blocking the stairwell entrance. While on route, Mr. Shuck

8  reported to Mandalay Bay personnel that someone was shooting a rifle in the 100-wing hallway

9  on the 32nd floor. Still, MGM failed to immediately and correctly report this information to law

10  enforcement, leading to a delayed and imprecise response by law enforcement, causing and

11  contributing to the injuries and damages suffered by Plaintiffs.

12  69.   For up to 20 minutes, the Shooter used an arsenal of weapons firing hundreds of

13  rounds at the Route 91 Festival without interruption, killing 58 guests, including Brian Fraser, and

14  injuring hundreds of others, including Stephanie Fraser, Rachel Sheppard, Jovanna and Francisco

15  Calzadillas, Nicholas Robone, and Anthony Robone. Despite having direct knowledge of the exact

16  location of the Shooter, at no point did MGM take any action to stop, deter, minimize the harm

   caused by the Shooter, or otherwise intervene.

17  70.   Despite the fact that Mr. Campos and Mr. Schuck both reported that shots were

18  coming from room 32-135 and the 100-wing hallway of the 32nd floor, MGM failed to properly

19  relay the Shooter's exact location to law enforcement or immediately send its own security to stop

20  the Shooter. The Report indicates law enforcement had "conflicting information on the exact

21  location of the Shooter(s) whether it was on the 31st, 32nd, or 33rd floors." Further when strike

22  teams arrived, each group was "given information the Shooter was possibly on the 29th or 31st

23  floor and taken there by elevator." Additional wrong information resulted in law enforcement

24  being sent to the Foundation Room on the top floor of the Mandalay Bay. These failures caused

25  by MGM allowed the Shooter to continue the Mass Shooting uninterrupted, causing and

26  contributing to Plaintiffs' injuries.

27  71.   During Jason Aldean's performance, Rachel Sheppard was shot three times—once

28  in the upper chest, once in the torso, and once in the abdomen. The shots threw her to the ground,

- 20 -

where she injured her back and laid down screaming and jolting in pain. One bullet was removed in surgery during her initial hospitalization. Another bullet was removed during an additional surgery in December 2017. Rachel continues to have one bullet and numerous fragments in her body.

72. During the ensuing chaos, a Good Samaritan picked Rachel up and carried her to the medical tent where she waited approximately 45 minutes for medical assistance. This Good Samaritan eventually forced himself into an ambulance and held Rachel Sheppard in the ambulance applying compresses to her bullet wounds. But for the heroic efforts of the Good Samaritan, Rachel Sheppard would probably have died at the scene like so many others. Rachel will be impacted and impaired for life as a result of the damages incurred.

73. Similarly, the Frasers were in attendance of the Route 91 Festival with a large group of family and friends watching Jason Aldean's performance. During the performance, they heard what sounded like packaged firecrackers go off. Although, at first, they did not believe the sounds were gun shots, upon hearing the noise again, their friend forced them to the ground to protect them.

74. While on the ground, Stephanie Fraser witnessed Brian Fraser crouch down to the ground and contort into a ball behind her. After the gun shots stopped, Stephanie Fraser began to stand up, and saw her husband and others fall to the ground when a second round of gunshots started.

75. One of the Frasers' friends confirmed Brian Fraser had been shot, and he moved Brian and Stephanie Fraser to the VIP section bleachers, where two other people attempted to give Brian Fraser CPR while Stephanie Fraser watched. Stephanie Fraser continued to watch her husband receive CPR until Good Samaritans placed Brian Fraser into a wheelbarrow and they were forced to leave the premises. As a result of the chaos surrounding the shooting and the lack of clearly defined exits, Stephanie Fraser became separated from her husband, and learned hours later that he did not survive.

76. Likewise, during Jason Aldean's performance, the Calzadillas were near the stage watching the final performance of the night. They were vacationing in Las Vegas after Francisco Calzadilla just returned home from deployment in the Middle East.

- 21 -

**FIRST AMENDED COMPLAINT**

77.     As the bullets began showering them from above, Jovanna Calzadillas was quickly shot in the head. Jovanna Calzadillas, with her palms on the pavement, laid unresponsive as her husband tried to shield her from the gunfire.

78.     In the wake of the shooting, Francisco Calzadillas carried his wife's lifeless body out of the concert venue, found a police officer in his vehicle and together drove to a local medical facility. Upon her arrival, Jovanna Calzadillas was evaluated in the trauma bay where significant brain matter was seen throughout the occipital aspect of her head.

79.     As a result of her injuries, Jovanna Calzadillas underwent a cranioplasty and tracheostomy, and she was eventually placed on a feeding tube. While Jovanna Calzadillas laid paralyzed and permanently disabled in the hospital, doctors informed Francisco Calzadillas that his wife would not survive, and they recommend that she be taken off life support.

80.     Furthermore, Nicholas Robone and his brother Anthony Robone attended the Route 91 Festival in celebration of Nicholas Robone's birthday. While watching Jason Aldean's performance together with several friends, Anthony Robone heard what he believed sounded like fireworks. A short period later, Nicholas Robone had been shot in the upper chest and began spitting up blood, which his brother witnessed. Anthony Robone then carried his brother away from the gunfire to safety and loaded him into an ambulance, which drove Nicholas Robone to the hospital while Anthony Robone stayed for approximately one hour to assist other victims.

81.     MGM failed to keep the Las Vegas Village venue reasonably safe, which also caused and contributed to Plaintiffs and other festival attendees' injuries. For instance, the festival lacked a sufficient number of available exits for rapid disbursement of a crowd, as MGM had closed, blocked off, locked or completely barricaded many exits. Likewise, the few exits that were available were not sufficiently marked with signs and/or were not well lit.

82.     Indeed, Plaintiffs believe that many of the venue exits for the venue were sealed to reduce MGM's security costs, and to prevent people from entering the festival without paying, thereby maximizing MGM's profits. Rather than employing additional security personnel to watch and maintain the additional emergency exits, Plaintiffs believe MGM cut staffing costs by sealing those exits.

**FIRST AMENDED COMPLAINT**

## C. MGM's Inadequate Security Policies and Procedures

83.     While the Mass Shooting itself lasted less than twenty minutes, it should not, could not, and would not have occurred but for the ongoing negligent acts and omissions of MGM.

84.     MGM employed, and continues to employ, inadequate security policies, procedures, and safeguards to detect improper and/or prohibited items and conduct, such as those used, and actions taken, by the Shooter.

85.     MGM holds itself out as the leading hospitality and entertainment company in the world. While its current portfolio stands at 27 properties, MGM views and promotes itself as "one united entertainment and hospitality company."

86.     MGM Resorts International grew its collection of properties, including some of its signature brands, in part by way of various mergers and acquisitions. Of consequence to the allegations made herein, MGM Resorts International announced in June 2004 that it entered into a definitive merger agreement with Mandalay Resort Group where the former would acquire the latter for an estimated $7.9 billion. As part of the acquisition, MGM Resorts International obtained Mandalay Resort Groups' portfolio of properties, including without limitation Mandalay Bay.

87.     MGM Resorts International sought, and continues to seek, to maximize its revenues in order to drive profit growth.

88.     Upon information and belief, MGM Resorts International achieves this by consolidating certain operations upon the completion of each merger and/or acquisition in order to eliminate redundancies and reduce its operating costs.  By way of example, MGM uses a single rewards program for its guests known as "M Life" for all its hotels. Additionally, prospective employees of MGM are required to apply online at a single online portal containing available job postings for all properties.

89.     Upon further information and belief, and at all times relevant herein, Mandalay Bay's security operations were also consolidated with MGM Resorts International in order to eliminate redundancies and reduce operating costs. Additionally, it is further believed that Mandalay Bay then adopted the security policies, procedures and/or protocols of MGM Resorts International, which are implemented and/or enforced across MGM's collection of properties. It

- 23 -

**FIRST AMENDED COMPLAINT**

is also believed that Mandalay Bay and MGM's other hotels use a common security management and record keeping system.

90. The majority of MGM's security is deliberately geared towards surveilling, monitoring, and/or observing gaming related activities to guard against theft. This includes, without limitation, access to the casino cage; the use of multiple security personnel when transporting markers, chips, or case; and employing thousands of cameras to surveil table games to prevent internal and external theft.

91. These security policies, procedures, and safeguards are intended to maximize MGM's profits, rather than ensure patrons' safety, by identifying instances of theft, recovering any lost monies stolen from the casino, identifying those individuals engaging in such conduct, and preventing such individuals from returning onto the property in the future.

92. MGM's additional security resources are focused on accommodation over security, where security personnel perform tasks unrelated to security such as carrying luggage, opening doors, and otherwise providing exceptional customer service. This, again, is intended to maximize MGM's profits, rather than take reasonable security measures for its patrons' safety.

93. Plaintiffs are informed and believe and herein allege that MGM's security resources are not dedicated to proactively detecting suspicious activity, firearms, and other prohibited weapons of that nature that could harms its guests, despite MGM's express prohibition of such items. Indeed, MGM deliberately allows its VIP guests, such as the Shooter, to breach its security policies and procedures in order to retain its VIP guests' business.

94. In addition, MGM has not updated its security policies, procedures, or safeguards to reflect and/or be commensurate with the increased volume of visitors coming onto its properties, especially at Mandalay Bay, notwithstanding its active efforts in soliciting such business.

95. Likewise, MGM has not updated its security policies, procedures or safeguards to reflect and/or be commensurate with the prevalence of terroristic threats and mass shootings in our society, which many other Las Vegas hotels have done.

96. In 2015, the Wynn Las Vegas Casino and Hotel ("Wynn Casino") warned other Las Vegas hotels, including Mandalay Bay, that Las Vegas was a "target city" and that Las Vegas hotels needed to dramatically increase their security procedures and protocols in order to

- 24 -

**FIRST AMENDED COMPLAINT**

1  adequately address future threats including gun violence. The Wynn Casino made such changes
2  in 2015.

3      97.     Although the Wynn Casino instituted a number of significant security
4  enhancements, MGM failed to do the same. For example, unlike Mandalay Bay, no Wynn Casino
5  guest would be permitted to keep a "Do Not Disturb" sign on a room for more than 12 hours
6  without investigation from the hotel. The Wynn Casino also required its employees to undergo
7  significant training designed to be on the alert for things out of the ordinary akin to a "see
8  something – say something" policy. Furthermore, the Wynn Casino has a strict no-gun policy
9  which, unlike Mandalay Bay, is enforced through metal detectors designed to prevent people from
10  bringing guns into the hotel in addition to dozens of armed plain clothed military trained security
11  guards. Unlike at the Mandalay Bay, the activity the Shooter engaged in prior to October 1, 2017,
12  would have raised a number of alarms at the Wynn Casino, and as a result, the shooting likely
13  never would have occurred. If MGM had these measures in place, the Shooter's weapons would
    likely have been detected and investigated, and the Mass Shooting never would have occurred.

14      98.     Like the Wynn Casino, many other hotels took action to prevent firearms in its
15  hotels and casino, not by just posting signs and adopting a policy, but by taking action, including
16  but not limited to using trained dogs, installing unseen metal detectors, posting specially trained
17  U.S. Embassy Marines at entrances, having Seal Team Six type former military trained personnel
18  roaming the property to prevent weapons and spot unusual or suspicious activity, participating in
19  intelligence briefings by LVMPD and the counter terrorism fusion center, and instituting 12 hour
20  checks on rooms for guest and property protection purposes when "Do Not Disturb" signs are
21  utilized. On the other end of the spectrum, MGM merely adopted an unenforced policy of no
22  firearms or weapons and then helped the Shooter, on multiple occasions, use the service elevator,
23  in violation of its own policy, to transport all or a vast majority of the assault rifles, ammunition,
24  and other prohibited items used to carry out the Mass Shooting that harmed Plaintiffs. If MGM
25  had taken the security measures that many of the other Las Vegas hotels should have had in place,
26  the Shooter's weapons would likely have been detected and investigated, and the Mass Shooting
27  never would have occurred.

28

- 25 -

**FIRST AMENDED COMPLAINT**

99.     The Las Vegas Metropolitan Police Department also foresaw something similar to the Mass Shooting more than six years ago when it implemented MACTAC (Multiple Assault Counter Terrorism Action Capabilities).  In preparation for its heroic response to this Mass Shooting, law enforcement trained every officer to identify and neutralize a wide variety of threats, including a lone wolf Shooter in a shopping mall, **a sniper on the Stratosphere**, and a coordinated attack by a terrorist militia.  Reportedly, plans were developed for how to deal with multiple threat scenarios at every hotel on the Las Vegas Strip, which included MGM's other properties.  For instance, sometime after May 2011 when the Sahara Hotel in Las Vegas closed, the FBI and LVMPD used the property for a training exercise to simulate an event almost identical to the Mass Shooting.  During the training exercise, the FBI and LVMPD placed a mannequin near a window inside one of the high-rise tower rooms to simulate an attacker.

100.     It was foreseeable to MGM that something catastrophic and/or similar to this event could occur, especially if one assisted and allowed an individual to accumulate approximately 22 assault rifles, one long rifle, one handgun, 5,000 rounds of ammunition, homemade gasmasks, sledge hammers, glass cutters, and power tools in its room overlooking a 20,000 person festival.

101.     MGM's industry also foresaw something similar to the Mass Shooting approximately 18 months prior to it actually occurring.

102.     In January 2016, an unfortunately prophetic article appeared in <u>Casino Journal</u> titled, "*The Growing and Changing Role of Casino Surveillance*."  In it, the author notes, "It's no longer all about card cheats and small-time criminals.  It's about ensuring that our employees and guests are not attacked **or shot** . . . Today, security and surveillance teams must be constantly prepared for a critical event or emergency, **such as an active Shooter** . . . This has become a continuing saga, and unfortunately it isn't going away for a while, if it ever does . . . our security and surveillance teams must be prepared to immediately **react properly to an active Shooter**.  **It is, sadly, an event that we may have to handle one day.**  Our world has changed, and so has protecting our casino property."  Therefore, it was foreseeable to MGM that something catastrophic, identical, and/or similar to the Mass Shooting could occur.

103.     MGM knew of industry opinion for potential active or mass shooters in 2013 or 2014 when they began training its "security" personnel on active or mass shooters.  Unfortunately,

- 26 -

**FIRST AMENDED COMPLAINT**

that training was inadequate and/or not followed between September 25 and October 1, 2017, which resulted in the injuries and damages to Plaintiffs.

104.    The events leading up to, in addition to, the Mass Shooting were foreseeable because MGM knew of this industry opinion and had notice and/or knowledge of prior incidents and/or similar wrongful acts occurring on Mandalay Bay premises, including assault and non-assault weapons found and confiscated on the casino floor and nightclubs.

105.    The events leading up to, in addition to, the Mass Shooting were foreseeable because MGM knew of this industry opinion and had notice and/or knowledge of prior incidents and/or similar wrongful acts occurring on Mandalay Bay premises, including assault weapons/firearms found and confiscated in hotel rooms.

106.    The events leading up to, in addition to, the Mass Shooting were foreseeable because MGM knew of this industry opinion and had notice and/or knowledge of prior incidents and/or similar wrongful acts occurring on Mandalay Bay premises, including non-assault weapons/firearms found and confiscated in hotel rooms.

107.    Based on information and belief, MGM had knowledge of one or more active gunman and/or gunfire incidents at Mandalay Bay and/or MGM's other properties prior to the Mass Shooting, showing such incidents were reasonably foreseeable.

108.    Based on information and belief, at the time of the Route 91 event, MGM had active shooter and/or terrorist incident insurance in effect showing such incidents were reasonably foreseeable.  In essence, the insurance industry recognized the risk of active shooters, performed an actuarial analysis of it, and set a price on the cost of coverage.  MGM also recognized the risk, performed a risk benefit analysis on the insurance industry coverage and price, and decided to pay the premium to reduce its risk.  Demonstrating that active shooters at MGM properties were not just foreseeable, but actually foreseen.

109.    The events leading up to, in addition to, the Mass Shooting were foreseeable because MGM knew of this industry opinion and had notice and/or knowledge of prior incidents and/or similar wrongful acts occurring on Mandalay Bay premises, including assault and non-assault weapons found and confiscated in hotel rooms.

**FIRST AMENDED COMPLAINT**

Case 2:18-cv-05564-JAK-FFM Document 24-2 Filed 07/10/18 Page 47 of 78 Page ID
#:468
Case 2:18-cv-01120-RFB-VCF Document 1 Filed 06/29/18 Page 29 of 69

110.    MGM knew of this industry opinion and the need to be prepared for an active shooter. This belief is based on the fact that MGM Defendants and its Executive Director of Corporate Security, Tom Lozich, were featured in the same *Casino Journal* publication as the above referenced article, on pages 21-24. Lozich describes MGM Resorts as being a "miniature city, with many complex events and operations being simultaneously managed." The article recognizes the Las Vegas Strip in particular as "a target for crime—anything from petty theft to **more nefarious plots**. Lozich describes MGM's approach to security, "The Corporate Watch Center—now operating 24/7—is a functioning in-house fusion center . . . the Watch Center is a single-stop station for resort personnel (security and other wise) to report suspicious activity, gain insight into trends and connect with corporate resources. Law enforcement also knows that they can reach out to the Watch Center for information instead of having to chase down appropriate security contact at each resort . . . A dedicated staff of *investigators* at the Watch Center *monitors the properties* and even street views around MGM properties, and they *gather suspicious activity* reporting through the robust "See Something, Say Something initiative in Las Vegas . . . Our 'See Something, Say Something" messaging is still non-stop for our employees. At the line level, those are the employees who can make or break anything that happens." Finally, Lozich recognizes, "We're a global company, and we have to be mindful of the security risks in the world that could impact not only our ability to function but (our ability) to protect our guests."

111.    It was not just foreseeable to MGM that something catastrophic and/or similar to this nefarious plot could occur, it was actually foreseen by Las Vegas Metro Police, the Las Vegas Casino industry, the insurance industry, and MGM. Unfortunately, MGMs' centralized corporate policy delayed immediate Shooter information being transmitted to law enforcement, which caused and/or contributed to Plaintiffs' injuries and damages.

112.    The online resource *Insurance Journal* and the Federal Emergency Management Agency ("FEMA") define an "active shooter incident" as "one or more individuals actively engaged in killing or attempting to kill people in a populated area."[1]  The Federal Bureau of

---

[1] Amy O'Connor, *As Active Shooter Incidents Increase, Industry Addresses Coverage 'Gray Area'*, INSURANCE JOURNAL (Aug. 11, 2016), https://www.insurancejournal.com/news/national/2016/08/11/422884.htm (last visited

**FIRST AMENDED COMPLAINT**

Investigation ("FBI") conducted a study of Active Shooter Incidents focusing on the years 2000 through 2013 and found that the "largest percentage of active shooter incidents – 45.6 percent – took place in a business."[2]  The FBI concluded that due to the growing number of active shooting incidents, there must be strong prevention efforts" by these businesses.[3]  The FBI then followed this report with a 2016 "analysis of 2014 and 2015 active shooter incidents" which found that the number of incidents was increasing each year, totaling 20 incidents per year in 2014 and 2015.[4]

113.   Many insurance companies now offer active shooter insurance programs to respond to these emerging risks.[5]  Some of the insurance policies available have "onsite active shooter and security vulnerability assessment, as well as preparedness seminars and training modules" for businesses.[6]

114.   The Department of Homeland Security ("DHS") and FEMA have been providing courses to assist "managers and employees" of businesses to address and prevent active shooter situations for several years now.[7]

115.   Less than one year before the Mass Shooting, the FBI and DHS published a Joint Special Event Threat Assessment report warning of the potential threat of lone offenders targeting mass gatherings, like music venues in Las Vegas.  The report states that lone offenders "are of particular concern due to their ability to remain undetected until operational; their willingness to attack civilians and soft targets; their ability to inflict significant casualties with weapons that do not require specialized knowledge, access, or training; and their unpredictability . . . ."

---

March 23, 2018); *see also* FEMA, *IS-907: Active Shooter; What You Can Do*, available at https://training.fema.gov/is/courseoverview.aspx?code=IS-907 (last visited March 23, 2018).
[2] FBI, *FBI Releases Study on Active Shooter Incidents* (September 24, 2014), https://www.fbi.gov/news/stories/fbi-releases-study-on-active-shooter-incidents (last visited March 23, 2018).
[3] *Id.*
[4] FBI, *Active Shooter Incidents in the United States in 2014 and* 2015, https://www.fbi.gov/file-repository/activeshooterincidentsus_2014-2015.pdf/view (last visited March 23, 2018); see also *As Active Shooter Incidents Increase, Industry Addresses Coverage 'Gray Area'*, *supra* note 1.
[5] *As Active Shooter Incidents Increase, Industry Addresses Coverage 'Gray Area'*, *supra* note 1.
[6] *Id.*
[7] DHS, *Active Shooter Presentation*, https://www.dhs.gov/active-shooter-preparedness (last visited March 23, 2018); DHS, *Human Resources or Security Professional*, https://www.dhs.gov/human-resources-or-security-professional (last visited March 23, 2018); *IS-907: Active Shooter; What You Can Do*, supra note 1.

- 29 -

**FIRST AMENDED COMPLAINT**

116. Dating back to at least 2005, the Nevada Homeland Security Commission has warned Las Vegas hotels and casino security staff that they should keep an eye out for a potential attack.

117. Given the numerous incidents involving active shooters in the country, the risk of being hurt or killed in an "Active Shooter" situation/incident became the focus of the National Safety Council during National Safety Month in June of 2017.[8] The National Safety Council reiterated the DHS's urging that businesses, including their managers and employees, be alert and aware of warning signs to prevent an active shooter situation as well as how to act during an active shooter situation because these incidents are often over within minutes, and sometimes before law enforcement even arrives on scene.[9]

118. The DHS and the FBI believe that individuals and establishments such as hotels, hospitals, and schools need to be prepared for an active shooter situation.[10]

119. The Centers for Disease Control ("CDC") and the National Institute for Occupational Safety and Health ("NIOSH") also urged employers to prepare for active shooters. NIOSH's "Vision" is "Safer, Healthier Workers" and its "Mission" is "[t]o develop new knowledge in the field of occupational safety and health and to transfer that knowledge into practice."[11] Specifically, during "safety month" (June 2017), NIOSH put together a plan for each week of the month to "Help Put an End to Preventable Deaths" with the third week entirely dedicated to dealing with active shooters which it believes "is something every organization needs to address."[12] One suggestion made is for businesses to have "active shooter drills" to protect people.[13]

---

[8] NCS, *Know how to respond to an active shooter* (June 27, 2017), http://www.safetyandhealthmagazine.com/articles/15872-know-how-to-respond-to-an-active-shooter (last visited March 23, 2018).
[9] *Id.*
[10] *Active Shooter Incidents in the United States in 2014 and* 2015, *supra* note 4; see also *As Active Shooter Incidents Increase, Industry Addresses Coverage 'Gray Area'*, *supra* note 1.
[11] CDC, *About NIOSH*, https://www.cdc.gov/niosh/about/default.html (last visited March 23, 2018).
[12] CDC, *Help Put an End to Preventable Deaths During National Safety Month 2017* (June 1, 2017), https://blogs.cdc.gov/niosh-science-blog/2017/06/01/national-safety-month-2017/ (last visited March 23, 2018).
[13] *Id.*

- 30 -

**FIRST AMENDED COMPLAINT**

120.   Despite so many organizations, such as the National Safety Council, CDC, DHS, FBI, and other agencies joining together to work towards preventing serious injuries and deaths caused by active shooters, as well as providing training to businesses to assist them in dealing with their response to active shooters, MGM failed to have adequate and effective plans, policies, and procedures in place to deal with an active shooter.

121.   Upon information and belief, in the timeframe immediately leading up to Mass Shooting, MGM significantly reduced its workforce, including, but not limited to, security personnel.

122.   Because of MGM's inadequate security measures:

a.   A single guest can check into multiple rooms, including under another person's name, without that named person ever appearing at the hotel;

b.   A single guest can carry seven large, heavy bags and suitcases containing assault rifles and ammunition at a time, and request to avoid the public elevators without MGM's concern;

c.   Over the course of several days, a single guest can carry approximately 25 bags and suitcases into his room containing an arsenal of weapons, with MGM's help and without MGM's concern; and

d.   Prior to the shooting and up to the present, anyone (patrons or non-patrons), with or without the consent or escort of MGM, can use service elevators for whatever purpose they choose, including to move oversized or numerous pieces of luggage, necessarily removing patrons from the normal security protocols in place at the hotel and against MGM's security policy.

123.   MGM's security measures are woefully deficient in dealing with the large number of guests visiting the property.  As a result, this enabled, and continues to enable, individuals to bring prohibited items onto the property such as explosives, ammunition, and/or firearms. Additionally, this enabled, and continues to enable, individuals to engage in prohibited activities and use dangerous items while on MGM's premises.

- 31 -

**FIRST AMENDED COMPLAINT**

124.    MGM's systemic security failures enabled and contributed to the Shooter bringing and using dangerous, prohibited items while on the premises.

125.    But for these inadequate and defective security policies, procedures, and safeguards employed by MGM, among other negligent conduct, the Mass Shooting would not and could not have occurred.

126.    But for MGM's reduction in security personnel, among other negligent conduct, the Mass Shooting would not and could not have occurred.

127.    But for MGM's failure to intervene, among other negligent conduct, Plaintiffs would not have been injured or killed.

128.    But for MGM's failure to take basic minimum precautions that are reasonably expected from a hotel owner, among other negligent conduct, Plaintiffs would not have been injured or killed.

129.    But for MGM deliberately focusing on identifying instances of theft, recovering lost monies stolen from the casino, watching money during scheduled pit drops and slot drops, and other acts that may affect its profits, Plaintiffs would not have been injured or killed.

130.    But for MGM's failure to exercise due care, among other negligent conduct, Plaintiffs would not have been injured or killed.

**D.    MGM's Joint Venture Prioritized Profit Over Security**

131.    MGM Resorts International holds itself out as the leading hospitality and entertainment company in the world.

132.    Upon information and belief, MGM sought, and continues to seek, to diversify its non-gaming revenues by obtaining a larger share of the entertainment segment in order to drive profit growth.

133.    As gaming revenues stagnate, decline and/or underperform, MGM has an interest, and continues to have interest, in the live entertainment market segment, particularly outdoor music festivals.

- 32 -

**FIRST AMENDED COMPLAINT**

134. Following the success of other competing music festivals held in Las Vegas, MGM converted a warehoused property originally envisioned for a resort hotel into real estate that could be used to generate revenue at a fraction of that cost.

135. Upon information and belief, MGM Resorts Festival Grounds owned, operated and/or maintained the Las Vegas Village that hosted the Route 91 Festival, at the direction of Defendant MGM Resorts' International.

136. Upon information and belief, and on or around that same timeframe, Defendants entered and participated in a joint venture when it promoted, organized, marketed, hosted, secured, and/or otherwise held the Route 91 Festival, which Rachel Sheppard, Stephanie Fraser, Brian Fraser, Jovanna Calzadillas, Francisco Calzadillas, Nicholas Robone, and Anthony Robone attended. Specifically:

      a. MGM individually, and as co-venturers, entered into a contractual relationship with one another – in the nature of an informal partnership – for purposes of organizing, hosting, marketing, securing, and/or otherwise holding the Route 91 Festival;

      b. MGM individually, and as co-venturers, conducted a business enterprise by promoting, organizing, marketing, hosting, securing, and/or otherwise holding the Route 91 Festival; and

      c. MGM, each of them, and as co-venturers, agreed to share jointly, or in proportion to capital contributed, in profits and losses from the Route 91 Festival.

137. Upon information and belief, and as part of the joint venture, MGM Resorts Festival Grounds provided the land for MGM to hold the Route 91 Festival and/or MGM Resorts Venue Management served as the event promotor of the Route 91 Festival.

138. As part of the joint venture, MGM's properties served as the official hotels for concert attendees also advertising marketing, and/or promoting the Route 91 Festival in and outside of their respective premises. This included giving free tickets to its hotel patrons and/or guests, providing exclusive hotel discounts only available to concert attendees, and providing transportation to and from the hotel/concert venue.

**FIRST AMENDED COMPLAINT**

139. MGM was acutely aware that music festivals historically lose money in their inaugural years of operation. "You've got to have a lot of stomach to put these big festivals on knowing that you will lose money in the first two to three years," stated Chris Baldizan, MGM Resorts International Senior Vice President.[14] "We invested some money into the site — it was essentially a run-down parking lot. We put some power in the venue, we paved it and cleaned it up. But there's nothing really permanent on the site," according to Mr. Baldizan.[15]

140. It is believed that MGM invested, and continues to invest, minimal amounts for the venue, instead putting the majority of financial resources into attracting high caliber talent to perform at the event at the expense of patron security. Such minimal investment includes, but is not limited to, the following:

   a. Temporary chain link fencing around the perimeter of the venue;

   b. Insufficient number of entrances for ingress/egress;

   c. The absence of permanent signage denoting specific areas of ingress and egress (*i.e.* emergency exits); and/or

   d. An accessible communication system for public use when ordinary communications are unavailable (*i.e.* emergency sirens).

141. As a result of MGM's conscious decision to invest more on talent and less on the venue itself, the Las Vegas Village ultimately was, and continues to be, an inherently unsafe venue susceptible to any type of mass casualty event whether a natural disaster, fire and/or act of terrorism.

142. MGM's inadequate security at the venue caused and/or contributed to the endless injuries and deaths that occurred on 1 October, including Plaintiffs.

---

[14] https://lasvegassun.com/blogs/kats-report/2016/apr/01/festival-grounds-has-a-cause-it-needs-more-parties/ (Last visited on January 5, 2018).

[15] http://ampthemag.com/the-real/qa-chris-baldizan-mgm-resorts-international/ (Last visited on January 5, 2018).

- 34 -

143.   Upon information and belief, and at all times relevant herein, Defendants were responsible for hiring, managing, training, and/or supervising event staff working at the Las Vegas Village.

144.   Pursuant to local codes and/or ordinances, Defendants were required to obtain an outdoor festival permit in order to hold the Festival. As permit holders, Defendants were required to meet certain conditions prior to holding such an event, which included submitting a detailed security plan.

145.   That Defendants, each of them, collaborated, discussed, organized, drafted and/or otherwise prepared a security plan for the Festival.

146.   A detailed security plan necessarily includes an emergency evacuation plan as well as policies and procedures in handling a mass casualty event, if and when it occurs.

147.   MGM failed to reasonably hire staff with the requisite experience and/or to properly train them in executing an emergency evacuation plan and responding to a mass casualty event. Such failures include, but are not limited to, the following:

   a. Not communicating, instructing, directing, assisting and/or guiding concert attendees to designated exits during an emergency; and/or

   b. Not executing an emergency evacuation plan to allow concert attendees to evacuate the premises.

148.   As a result, this curtailed, stopped and/or prevented concert attendees, including Plaintiffs, from reasonably exiting and/or escaping from the venue: (1) once the shooting began; (2) at each interval when the shooter paused to reload or switch weapons; (3) and/or at the end of the massacre. Instead, Plaintiffs, each of them, were forced to seek shelter from a barrage of bullets while essentially imprisoned within a chain-link cage.

149.   MGM, each of them, and as co-venturers, are jointly and severally liable to Plaintiffs for the wrongful acts and conduct committed in furtherance of the joint venture.

150.   That MGM's negligent acts, omissions, and conduct in organizing, hosting, marketing, securing, and/or otherwise holding the Route 91 Festival is imputed to each and every

- 35 -

**FIRST AMENDED COMPLAINT**

co-venturer of the joint enterprise rendering those participating in the joint venture liable for Plaintiffs' injuries.

151.    But for MGM's failures, the events of 1 October would not, should not, and could not have occurred.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Negligence

152.    Plaintiffs reallege and incorporate by reference every allegation contained in this Complaint as though fully set forth herein.

153.    At all relevant times, MGM had a duty of reasonable care in the protection and safeguarding of persons on the Mandalay Bay, MGM premises and Las Vegas Village, including persons in attendance at the Route 91 Festival venue, and the properties and areas leading to and from the festival.

154.    At all relevant times, MGM had a duty of reasonable care to prevent firearms and/or weapons from being allowed on the Mandalay Bay premises, including, but not limited to, rooms 32-135 and 32-134.

155.    At all relevant times, MGM knew or should have known that it was reasonably foreseeable that a breach of its duties to keep its premises reasonably safe and free from firearms and weapons would result in injury or death to its guests.

156.    This is especially true where MGM allowed a single guest to carry approximately 25 bags and suitcases containing approximately 22 assault rifles, one long rifle, one handgun, 5,000 rounds of ammunition, tripods, homemade gas masks, power tools, glass cutters, and sledge hammers into one or two rooms of its Mandalay Bay hotel, which overlooked a concert with at least 20,000 attendees that MGM promoted to its guests.

157.    MGM breached its duty of reasonable care by failing to maintain the Mandalay Bay premises in a reasonably safe condition, including, but not limited to, the following:

      a.    failing to properly surveil people coming and going from the hotel;

      b.    failing to monitor the hotel premises with a closed-circuit television;

- 36 -

**FIRST AMENDED COMPLAINT**

Case 2:18-cv-05564-JAK-FFM Document 24-2 Filed 07/05/19 Page 56 of 78 Page ID
#:477
Case 2:18-cv-01120-RFB-VCF Document 9 Filed 06/29/18 Page 38 of 60

c.  failing to discover some or all of the Shooter's arsenal of weapons, ammunition, explosive material or other prohibited items between September 25, 2017 and October 1, 2017;

d.  assisting the Shooter with transporting all or part of his arsenal of weapons, ammunition, explosive material and other prohibited items between September 25, 2017 and October 1, 2017, through the nonpublic service elevator;

e.  assisting the Shooter on September 29, 2017, with checking into a second suite in his girlfriend's name, despite the Shooter staying alone;

f.  failing to conduct any investigation into a single individual that carried approximately 25 bags and suitcases into two rooms, which oversaw the Route 91 Festival grounds owned by MGM (in which he stayed in alone);

g.  failing to timely respond to, or otherwise act upon, the Shooter's internal shooting at Mandalay Bay, including, but not limited to, the shooting of Mandalay Bay security guard Jesus Campos (who waited nearly one hour before going to the 32nd floor after receiving an alert coming from another guests' room);

h.  failing to notice or take precautions against the Shooter's delivery of guns, ammunition, explosive material, and other prohibited items to his hotel room;

i.  failing to notice or take action against the Shooter's installation and setup of surveillance cameras outside his hotel rooms;

j.  failing to adequately prevent, respond or timely discover the Shooter's breaking out and opening of the Mandalay Bay hotel room windows;

k.  failing to adequately train and supervise employees on the reporting and discovery of suspicious individuals, persons, and/or activities;

l.  failing to adequately train and supervise employees as recommended by the National Safety Council, CDC, DHS, and FBI;

- 37 -

**FIRST AMENDED COMPLAINT**

m.    failing to investigate the Shooter's room after a "Do Not Disturb" sign remained on the Shooter's door for more than 12 hours;

n.    failing to investigate the Shooter's room after a "Do Not Disturb" sign remained on the Shooter's door for more than 36 hours;

o.    failing to timely discover the stairwell door bolted closed;

p.    failing to discover and/or investigate the use of power tools by the Shooter, which modified the Hotel Premises;

q.    failure of MGM personnel to discover and report the arsenal of weapons, ammunition, explosive material and other prohibited items in the Shooter's rooms;

r.    failing to report the arsenal of weapons, ammunition, explosive material and other prohibited items discovered by MGM personnel servicing the room and its hotel gusts;

s.    failing to respond to reports of the arsenal of weapon, ammunition, explosive material, and other prohibited items discovered by MGM personnel servicing the room and its hotel guests;

t.    failure of room service/in room dining personnel to discover and report the arsenal of weapon, ammunition, explosive material, and other prohibited items in the Shooter's suite;

u.    failing to report the arsenal of weapons, ammunition, explosive material, and other prohibited items discovered by MGM personnel servicing the room and its hotel guests;

v.    failing to respond to reports of the arsenal of weapon, ammunition, explosive material, and other prohibited items discovered by MGM personnel servicing the room and its hotel guests;

w.    failing to discover or investigate explosive material in the Shooter's vehicle;

x.    failing to employ adequate safety measures;

y.    failing to exercise due care;

- 38 -

**FIRST AMENDED COMPLAINT**

z. failing to take minimal safety precautions to ensure the safety of guests on its premises;

aa. delaying the notification of law enforcement of the Shooter's activity and/or location;

bb. failing to adequately and promptly notify law enforcement of the Shooter and/or his activities;

cc. failing to have a plan for an active Shooter;

dd. failing to properly respond to an active Shooter situation;

ee. failing to properly train and supervise employees, contractors, vendors, guests of the plan of action in case of an active Shooter situation;

ff. failing to properly respond to an emergency situation;

gg. failing to properly implement and execute active Shooter plan.

158. MGM further breached its duty of reasonable care by failing to maintain the Las Vegas Village in a reasonably safe condition, including, but not limited to, for having as follows:

a. Temporary chain link fencing around the perimeter of the venue;

b. Insufficient number of entrances for ingress/egress;

c. The absence of permanent signage denoting specific areas of ingress and egress (*i.e.* emergency exits); and/or

d. An accessible communication system for public use when ordinary communications are unavailable (*i.e.* emergency sirens).

159. MGM failed to reasonably hire staff with the requisite experience and/or to properly train them in executing an emergency evacuation plan and responding to a mass casualty event, including, but are not limited to:

a. Communicating, instructing, directing, assisting and/or guiding concert attendees to designated exits during an emergency; and/or

b. Executing an emergency evacuation plan to allow concert attendees to evacuate the premises.

- 39 -

**FIRST AMENDED COMPLAINT**

160.    MGM is further liable for the negligence of its employees pursuant to the doctrine of *respondeat superior*, and the negligence of its agents under the doctrine of vicarious liability.

161.    Based on the totality of the circumstances surrounding the Shooter's September 25, 2017 to October 1, 2017 stay at Mandalay Bay, MGM knew, or should have known, that it was foreseeable that the Shooter could cause harm to someone on and/or adjacent to its premises.

162.    That MGM acted recklessly, maliciously, and/or oppressively with intent to allow injury to Plaintiffs.

163.    That MGM's failures amount to a conscious disregard for the safety of Plaintiffs, and others so as to constitute malice and oppression, and Plaintiffs are entitled to exemplary or punitive damages in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

164.    As a direct and proximate result of MGM's wrongful conduct, Plaintiffs, each of them, suffered severe injury to their body and mind, past and future medical expenses, past and future pain and suffering, past and future severe emotional distress, disfigurement, loss of enjoyment of life, loss of past and future earning capacity and anticipated future loss of income, all to their damage in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

165.    As a direct and proximate result of MGM's wrongful conduct, and the resulting death of Brian Fraser, Lotus Herrera as Special Administrator of the Estate of Brian Fraser, has incurred emergency, medical, funeral and burial expenses in an amount not yet ascertained, and when said amount is ascertained, Stephanie Fraser will seek leave of Court to amend this Complaint to allege said amount.

166.    The Estate of Brian Fraser is also entitled to general damages and exemplary or punitive damages that decedent Brian Fraser would have recovered had he survived.

167.    Due to MGM's wrongful conduct as alleged herein, Rachel Sheppard has been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

168.    Due to MGM's wrongful conduct, as alleged herein, the Fraser Plaintiffs have been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

- 40 -

**FIRST AMENDED COMPLAINT**

1    169.    Due to MGM's wrongful conduct as alleged herein, Lotus Herrera as Special

2    Administrator of the Estate of Brian Fraser, has been required to retain the services of Robinson

3    Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

4    170.    Due to MGM's wrongful conduct as alleged herein, the Calzadillas Plaintiffs have

5    been required to retain the services of Eglet Prince and Gallagher & Kennedy and to incur

6    attorney's fees and costs thereby.

7    171.    Due to MGM's negligence as alleged herein, Nicholas and Anthony Robone have

8    been required to retain the services of Panish Shea and Boyle LLP and to incur attorney's fees and

9    costs thereby.

10                              **SECOND CLAIM FOR RELIEF**

                    **Negligence Against Defendant MGM Resorts International**

11   172.    Plaintiffs reallege and incorporate by reference every allegation contained in this

12   Complaint as though fully set forth herein.

13   173.    At all times herein mentioned, Defendant MGM Resorts International, undertook,

14   gratuitously and for consideration, to render services to Mandalay Bay and to Plaintiffs and

15   Plaintiff's Decedents, which Defendant MGM Resorts International should have recognized, and

16   did recognize, as necessary for the protection of third persons, including Plaintiffs and Plaintiff's

17   Decedents.    Specifically, Defendant MGM Resorts International undertook to provide

18   comprehensive and centralized security procedures, protocols, communications and affirmative

19   protective actions in response to security and safety threats to guests, patrons, and members of the

20   public at the various resorts, hotels and associated properties.

21   174.    In doing so, the Defendant MGM Resorts International knew that its failure to

22   exercise reasonable care in the performance and rendering of this undertaking would increase the

23   risk of harm to third persons, including Plaintiffs and Plaintiff's Decedents, and that they would

24   be subjected to physical harm thereby. Defendant MGM Resorts International also knew that it

25   was undertaking performance of duties of care owed by Mandalay Bay to Plaintiffs and Plaintiff's

26   Decedents, and that Plaintiffs and Plaintiff's Decedents upon the undertaking.

27   175.    Defendant MGM Resorts International was negligent and failed to exercise

28   reasonable care in the performance and rendering of this undertaking by, among other things, and

- 41 -

**FIRST AMENDED COMPLAINT**

1   not by way of limitation, removing security authority from Mandalay Bay and centralizing such

2   security authority to a "single stop station" "Corporate Watch Center" off premises, thereby

3   diminishing localized control and the ability of Mandalay Bay to immediately and promptly

4   communicate with law enforcement, resulting in critical delays in communication to law

5   enforcement personnel, and delaying the time for them to respond and arrive at the scene of the

6   shooting.

7   176.    As a direct and proximate result of MGM Resorts International's breach of its duty

8   of reasonable care, and failure to exercise reasonable care in the performance of said undertaking,

9   Plaintiffs and Plaintiff's' Decedents suffered the injuries and damages as herein alleged.

### THIRD CLAIM FOR RELIEF

**Loss of Consortium**

12   177.    Plaintiffs reallege and incorporate by reference every allegation contained in this

Complaint as though fully set forth herein.

14   178.    Stephanie Fraser and decedent Brian Fraser were, at all times relevant to this action,

husband and wife, having entered into a legally valid marriage.

16   179.    That Plaintiff, Stephanie Fraser, as the lawful wife of Plaintiff, Brian Fraser, was,

and is, entitled to the society, comfort, affection, services, companionship and consortium of her

husband.

19   180.    That as a direct and proximate result, of the negligence of the Defendants, and each

20   of them, Plaintiff Brian Fraser, was killed, thereby denying Plaintiff, Stephanie Fraser, the society,

21   comfort, affection, services, companionship and consortium of her husband, all to her general

damages in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

23   181.    Due to MGM's wrongful conduct as alleged herein, Stephanie Fraser has been

required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur

attorney's fees and costs thereby.

25   182.    Jovanna Calzadillas and Francisco Calzadillas were, at all times relevant to this

26   action, husband and wife, having entered into a legally valid marriage.

**FIRST AMENDED COMPLAINT**

183.     That Plaintiff, Francisco Calzadillas, as the lawful husband of Plaintiff, Jovanna Calzadillas, was, and is, entitled to the society, comfort, affection, services, companionship and consortium of his wife.

184.     That as a direct and proximate result, of the negligence of the Defendants, and each of them, Plaintiff Jovanna Calzadillas, was injured, thereby denying Plaintiff, Francisco Calzadillas, the society, comfort, affection, services, companionship and consortium of her husband, all to his general damages in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

185.     Due to MGM's wrongful conduct as alleged herein, Francisco Calzadillas has been required to retain the services of Eglet Prince and Gallagher & Kennedy and to incur attorney's fees and costs thereby.

### FOURTH CLAIM FOR RELIEF

#### Wrongful Death

186.     Plaintiffs reallege and incorporate by reference every allegation contained in this Complaint as though fully set forth herein.

187.     Pursuant to Nevada Revised Statute ("NRS") 41.085(2), "[w]hen the death of any person ... is caused by the wrongful act or neglect of another, the heirs of the decedent and the personal representatives of the decedent may each maintain an action for damages against the person who caused the death . . . ."

188.     That as a direct and proximate result of the negligence of Defendants, and each of them, Brian Fraser, the decedent, suffered fatal injuries and Plaintiffs have sustained damages in excess of Fifteen Thousand Dollars ($15,000.00).

189.     That as a further direct and proximate result of Defendants' negligence, acts and omissions, from the time of the Decedent's injuries until his death, Decedent suffered intense physical and metal pain disfigurement, shock and agony, all to his damage recoverable by Plaintiffs, in an amount to be determined at trial.

190.     That Defendants, each of them, acted recklessly, maliciously, and/or oppressively with intent to allow injury to the Decedent.  That Defendants' failures amount to a conscious disregard for the safety of Decedent and others, so as to constitute malice and oppression.  For the

- 43 -

reasons set forth above, Plaintiffs are entitled to exemplary damages in an amount to be determined at trial.

191. Stephanie Fraser as the surviving spouse of decedent Brian Fraser; Lotus Herrera as the Special Administrator for the Estate of Brian Fraser; Stephanie Fraser as Guardian Ad Litem for Aubree Fraser, a minor child of decedent Brian Fraser; and Stephanie Fraser as Guardian Ad Litem for Brayden Fraser, a minor child of decedent Brian Fraser, are heirs to decedent Brian Fraser and are entitled to maintain an action for damages against Defendants for wrongful death, including, but not limited to, damages set forth in N.R.S. 41.085 in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

192. As a result of the injuries to and resulting death of Brian Fraser, Stephanie Fraser, Aubree Fraser, and Brayden Fraser are entitled to pecuniary damages for their grief or sorrow, loss of probable support, companionship, society, comfort and consortium, and damages for pain, suffering or disfigurement of the decedent.

193. As a result of the injuries to and death of Brian Fraser, Lotus Herrera as Special Administrator to the Estate of Brian Fraser may recover any special damages, such as medical expenses, which the decedent Brian Fraser incurred or sustained before his death, and funeral expenses; and any penalties including, but not limited to, exemplary or punitive damages, that decedent Brian Fraser would have recovered if he had survived.

194. Due to MGM's negligence and wrongful conduct, Plaintiffs have been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

**FIFTH CLAIM FOR RELIEF**

**Premises Liability**

195. Plaintiffs reallege and incorporate by reference every allegation contained in this Complaint as though fully set forth herein.

196. At all times mentioned, MGM was the owner, manager, supervisor, maintainer, operator, and/or controller of the premises and common area known as Las Vegas Village located at 3901 South Las Vegas Boulevard, Las Vegas, NV 89119.

**FIRST AMENDED COMPLAINT**

197.    At all times mentioned herein, MGM was the owner, manager, supervisor, maintainer, operator, and/or controller of the premises and common area known as Mandalay Bay located at 3950 South Las Vegas Boulevard, Las Vegas, NV 89119.

198.    At all times mentioned herein, Mandalay Bay was located adjacent to and connected with other MGM hotels, including, but not limited to, Excalibur, Delano, and Luxor.

199.    At all times mentioned herein, and upon information and belief, Mandalay Bay shares a common security management and record keeping systems with other MGM hotels, including, but not limited to, Excalibur, Delano, and Luxor.

200.    At all times mentioned herein, the Las Vegas Village was a part of the premises of Mandalay Bay and MGM's other hotels, as defined in N.R.S. 651.005, because it is a "recreational facility or other land, used or maintained in connection with the [Mandalay Bay] hotel" and MGM's other hotels.

201.    At all times mentioned herein, MGM owed a duty of care to concert-goers and hotel guests like Plaintiffs.

202.    At all times mentioned herein, MGM failed to exercise due care for the safety of Plaintiffs.

203.    At all times mentioned herein, MGM negligently failed to reasonably secure, inspect, maintain, and/or supervise said premises, failed to keep said premises reasonably safe, and further failed to protect Plaintiffs from dangers and/or hazards, which resulted in Plaintiffs' injuries.

204.    As a direct and proximate cause of MGM's failures, omissions, and wrongful conduct, Plaintiffs sustained numerous injuries, as alleged herein.

205.    MGM negligently, willfully, and/or recklessly failed to perform certain responsibilities and duties owed to Plaintiffs, inter alia:

    a.  By failing to exercise due care for the safety of its patrons, ignoring countless signs of suspicion that, if noticed, would have prevented, or significantly thwarted, the Shooter's efforts;

    b.  By failing to have adequately trained or competent personnel on duty, including security guards and/or hotel personnel, at the time of the attack to respond adequately to the shooting;

- 45 -

**FIRST AMENDED COMPLAINT**

c. By failing to install and/or properly use monitoring equipment or audio equipment on the premises to discover, or even investigate, the Shooter;

d. By focusing its security efforts on instances of theft against the casino, and not on the safety of its patrons;

e. By failing to establish and enforce such other measures necessary and reasonable to protect Plaintiffs from physical attack and death, thereby failing to provide a reasonably safe venue; and

f. By failing to enforce its own policies and procedures.

206. MGM breached its duty to Plaintiffs to maintain a reasonably safe environment, and acted negligently by failing to provide adequate security for the premises.

207. MGM knew or should have known that the lack of staffing and inadequate security policies and procedures made it susceptible to cause the injuries to Plaintiffs, and should have warned Plaintiffs of such risks.

208. Prior to the events of the Mass Shooting, the inherently unsafe condition of the premises was known by, or should have been known by, MGM, in the exercise of reasonable care.

209. MGM knew or should have known that the failure to develop, monitor, operate and/or control the premises in a reasonable safe manner made it susceptible to a mass casualty event that could lead to injury and/or death of those at its premises including, but not limited to, those in attendance of the Route 91 Festival.

210. The injuries to Plaintiffs were proximately caused by MGM's failure to properly staff and maintain adequate security policies and procedures for its premises, among other things.

211. As a direct and proximate result of MGM's wrongful conduct, Plaintiffs, each of them, suffered severe injury to their body and mind, past and future medical expenses, past and future pain and suffering, past and future severe emotional distress, disfigurement, loss of enjoyment of life, loss of past and future earning capacity and anticipated future loss of income, all to their damage in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

212. As a direct and proximate result of MGM's wrongful conduct, and the resulting death of Brian Fraser, Lotus Herrera as Special Administrator of the Estate of Brian Fraser, has incurred emergency, medical, funeral and burial expenses in an amount not yet ascertained, and

- 46 -

**FIRST AMENDED COMPLAINT**

when said amount is ascertained, Stephanie Fraser will seek leave of Court to amend this Complaint to allege said amount. Lotus Herrera as Special Administrator of the Estate of Brian Fraser is also entitled to general damages and exemplary or punitive damages that decedent Brian Fraser would have recovered had he survived.

213. Due to MGM's negligent and wrongful conduct, Rachel Sheppard has been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

214. Due to MGM's negligent and wrongful conduct, the Fraser Plaintiffs have been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

215. Due to MGM's negligent and wrongful conduct, Lotus Herrera as Special Administrator of the Estate of Brian Fraser, has been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

216. Due to MGM's negligent and wrongful conduct, the Calzadillas Plaintiffs have been required to retain the services of Eglet Prince and Gallagher & Kennedy and to incur attorney's fees and costs thereby.

217. Due to MGM's negligent and wrongful conduct, Nicholas Robone has been required to retain the services of Panish Shea and Boyle LLP and to incur attorney's fees and costs thereby.

### SIXTH CLAIM FOR RELIEF

#### Negligent Infliction of Emotional Distress

218. Plaintiffs reallege and incorporate by reference every allegation contained in this Complaint as though fully set forth herein.

219. MGM owed a duty to exercise due care not to subject Plaintiffs to foreseeable risk of mental, emotional and/or physical injury, and MGM knew or reasonably should have known that such acts and/or omissions of MGM as herein alleged, were likely to result in mental, emotional and/or physical injury to Plaintiffs.

- 47 -

**FIRST AMENDED COMPLAINT**

220.     MGM while engaging in the aforementioned conduct did negligently inflict extreme mental and emotional distress, indignity, embarrassment, and humiliation upon Plaintiffs, and did breach that duty to Plaintiffs.

221.     Rachel Sheppard suffered and continues to suffer serious emotional distress and physical injuries due to the negligence of MGM.

222.     Stephanie Fraser suffered and continues to suffer serious emotional distress resulting in physical symptoms caused by both her physical and emotional injuries as well as those resulting from her witnessing the shooting and eventual death of her decedent husband Brian Fraser.

223.     Francisco Calzadillas suffered and continues to suffer serious emotional distress resulting in physical symptoms caused by the Mass Shooting and witnessing his spouse get shot in the head, due to the negligence of MGM.

224.     Anthony Robone suffered and continues to suffer serious emotional distress resulting in physical symptoms caused by the Mass Shooting, due to the negligence of MGM.

225.     Plaintiffs have suffered and continue to suffer serious emotional distress causing physical injury and illness as a result of the negligence and wrongful conduct of MGM, all to their damage in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

226.     Due to MGM's negligent and wrongful conduct, Rachel Sheppard has been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

227.     Due to MGM's negligent and wrongful conduct, the Fraser Plaintiffs have been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

228.     Due to MGM's negligent and wrongful conduct, Lotus Herrera as Special Administrator of the Estate of Brian Fraser, has been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

229.     Due to MGM's negligent and wrongful conduct, the Calzadillas Plaintiffs have been required to retain the services of Eglet Prince and Gallagher & Kennedy and to incur attorney's fees and costs thereby.

- 48 -

**FIRST AMENDED COMPLAINT**

230.   Due to MGM's negligent and wrongful conduct, Nicholas and Anthony Robone have been required to retain the services of Panish Shea and Boyle LLP and to incur attorney's fees and costs thereby.

## SEVENTH CLAIM FOR RELIEF

### Negligence Per Se

231.   Plaintiffs reallege and incorporate by reference every allegation contained in this Complaint as though fully set forth herein.

232.   At all times mentioned herein, there were in force statutes, ordinances, and regulations prohibiting the conduct exhibited by MGM, including without limitation Chapter 6.67 *et seq.* of the Clark County Code of Ordinances.

233.   The acts of MGM, as alleged herein, violated the statutes, ordinances, and regulations which constitutes negligence per se.

234.   Plaintiffs were all members of the class of persons for whose protection said statutes, ordinances, and regulations were enacted or promulgated.

235.   Plaintiffs sustained injuries that were the type said statutes, ordinances, and regulations were intended to prevent.

236.   MGM is liable for the damages sustained by Plaintiffs.

237.   As a direct and proximate result of all the foregoing and as a result of the acts and/or omissions of MGM, Plaintiffs have sustained physical, mental, and emotional harm.

238.   The wrongful conduct, acts, or omissions were conducted in a wanton, willful, malicious manner, with conscious disregard for Plaintiffs' rights.

239.   The acts of MGM should be assessed punitive or exemplary damages.

240.   As a direct and proximate result of all the foregoing and as a result of the acts and/or omissions of MGM, Plaintiffs have sustained and will continue to sustain the above-mentioned injuries.

241.   As a direct and proximate result of MGM's wrongful conduct, Plaintiffs, each of them, suffered severe injury to their body and mind, past and future medical expenses, past and future pain and suffering, past and future severe emotional distress, disfigurement, loss of

- 49 -

**FIRST AMENDED COMPLAINT**

enjoyment of life, loss of past and future earning capacity and anticipated future loss of income, all to their damage in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

242. As a direct and proximate result of MGM's wrongful conduct, and the resulting death of Brian Fraser, Lotus Herrera as Special Administrator of the Estate of Brian Fraser, has incurred emergency, medical, funeral and burial expenses in an amount not yet ascertained, and when said amount is ascertained, Stephanie Fraser will seek leave of Court to amend this Complaint to allege said amount. Lotus Herrera as Special Administrator of the Estate of Brian Fraser is also entitled to general damages and exemplary or punitive damages that decedent Brian Fraser would have recovered had he survived.

243. Due to MGM's wrongful conduct, acts and omissions, Rachel Sheppard has been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

244. Due to MGM's wrongful conduct, acts and omissions, the Fraser Plaintiffs have been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

245. Due to MGM's wrongful conduct, acts and omissions, Lotus Herrera as Special Administrator of the Estate of Brian Fraser, has been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

246. Due to MGM's wrongful conduct, acts and omissions, the Calzadillas Plaintiffs have been required to retain the services of Eglet Prince and Gallagher & Kennedy and to incur attorney's fees and costs thereby.

247. Due to MGM's wrongful conduct, acts and omissions, Nicholas and Anthony Robone have been required to retain the services of Panish Shea and Boyle LLP and to incur attorney's fees and costs thereby.

## EIGHTH CLAIM FOR RELIEF

### Nuisance

248. Plaintiffs reallege and incorporate by reference every allegation contained in this Complaint as though fully set forth herein.

- 50 -

**FIRST AMENDED COMPLAINT**

249.   Plaintiffs were ticket holders with the right to occupy, attend, and/or otherwise be present at the venue for the Route 91 Festival, including grounds and adjacent property controlled and owned by MGM.

250.   MGM, by way of its acts and omissions, created and/or permitted an ongoing condition, namely MGM's failure in operating a high traffic resort hotel without adequate security measures in place to detect, identify, and/or otherwise prevent patrons with dangerous weapons from coming onto its premises.

251.   The existence of that ongoing condition was harmful to Plaintiffs' health, safety and welfare so as to substantially interfere with Plaintiffs' comfortable enjoyment of life.

252.   This condition substantially interfered with Plaintiffs' use of the hotel and concert venue, including enjoyment of the Route 91 Festival and Plaintiffs did not consent to MGM's conduct.

253.   An ordinary person would be disturbed by MGM's conduct.

254.   MGM's failure in operating its business without adequate security measures in place was a substantial factor in causing Plaintiffs' harm.

255.   The seriousness of the harm outweighed the public benefit of MGM's conduct, namely that MGM must enact, develop and/or implement reasonable security measures so patrons in close proximity to such business operations will not be unreasonably harmed as a result.

256.   As a direct and proximate result of all the foregoing and as a result of the acts and/or omissions of MGM, Plaintiffs have sustained damages in an amount in excess of Fifteen Thousand Dollars ($15,000.00), both individually and collectively.

257.   That at all times mentioned herein, MGM acted with fraud, oppression, and/or malice toward Plaintiffs, exhibited a recklessness to injure Plaintiffs and/or a conscious disregard for the rights and safety of Plaintiffs, and MGM should be punished and made an example of by imposition of punitive or exemplary damages in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

258.   As a direct and proximate result of all the foregoing and as a result of the acts and/or omissions of MGM, Plaintiffs have sustained and will continue to sustain the above-mentioned injuries.

- 51 -

**FIRST AMENDED COMPLAINT**

1      259.   As a direct and proximate result of MGM's wrongful conduct, Plaintiffs, each of them, suffered severe injury to their body and mind, past and future medical expenses, past and future pain and suffering, past and future severe emotional distress, disfigurement, loss of enjoyment of life, loss of past and future earning capacity and anticipated future loss of income, all to their damage in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

260.   As a direct and proximate result of MGM's wrongful conduct, and the resulting death of Brian Fraser, Lotus Herrera as Special Administrator of the Estate of Brian Fraser, has incurred emergency, medical, funeral and burial expenses in an amount not yet ascertained, and when said amount is ascertained, Stephanie Fraser will seek leave of Court to amend this Complaint to allege said amount.   Lotus Herrera as Special Administrator of the Estate of Brian Fraser is also entitled to general damages and exemplary or punitive damages that decedent Brian Fraser would have recovered had he survived.

261.   Due to MGM's wrongful conduct, acts and omissions, Rachel Sheppard has been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

262.   Due to MGM's wrongful conduct, acts and omissions, the Fraser Plaintiffs have been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

263.   Due to MGM's wrongful conduct, acts and omissions, Lotus Herrera as Special Administrator of the Estate of Brian Fraser, has been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

264.   Due to MGM's wrongful conduct, acts and omissions, the Calzadillas Plaintiffs have been required to retain the services of Eglet Prince and Gallagher & Kennedy and to incur attorney's fees and costs thereby.

265.   Due to MGM's wrongful conduct, acts and omissions, Nicholas and Anthony Robone have been required to retain the services of Panish Shea and Boyle LLP and to incur attorney's fees and costs thereby.

### NINTH CLAIM FOR RELIEF

### Negligent Hiring, Retention, and Supervision

- 52 -

**FIRST AMENDED COMPLAINT**

266. Plaintiffs reallege and incorporate by reference every allegation contained in this Complaint as though fully set forth herein.

267. MGM owed a duty of care to hotel guests and concert-goers like Plaintiffs.

268. MGM was negligent in the selection, hiring, training, supervision and/or retention of its employees, agents, servants, partners, associates, and/or associations, at all times relevant herein.

269. MGM by and through its employees, agents, servants, partners, associates, and/or associations, breached its duty of care by failing to put into place safety protocols when it knew or should have known that its employees and/or agents and/or servants might cause a high risk to innocent parties such as Plaintiffs.

270. MGM is vicariously liable for damages resulting from its employees', agents', servants', partners', associates' and/or associations' negligent actions against Plaintiffs during the scope of employment.

271. As a direct and proximate result of MGM's negligent hiring, retention, and supervision, Plaintiffs sustained general and special damages in excess of Fifteen Thousand Dollars ($15,000.00).

272. MGM acted recklessly, maliciously, and/or oppressively with intent to allow injury to Plaintiffs. MGM's failures amount to a conscious disregard for the safety of Plaintiffs, and others so as to constitute malice and oppression. For the reasons set forth above, Plaintiffs are entitled to exemplary damages in an amount to be determined at trial.

273. As a direct and proximate result of all the foregoing and as a result of the acts and/or omissions of MGM, Plaintiffs have sustained and will continue to sustain the above-mentioned injuries and damages.

274. As a direct and proximate result of MGM's negligent conduct, Plaintiffs, each of them, suffered severe injury to their body and mind, past and future medical expenses, past and future pain and suffering, past and future severe emotional distress, disfigurement, loss of enjoyment of life, loss of past and future earning capacity and anticipated future loss of income, all to their damage in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

**FIRST AMENDED COMPLAINT**

275.  As a direct and proximate result of MGM's wrongful conduct, and the resulting death of Brian Fraser, Lotus Herrera as Special Administrator of the Estate of Brian Fraser, has incurred emergency, medical, funeral and burial expenses in an amount not yet ascertained, and when said amount is ascertained, Stephanie Fraser will seek leave of Court to amend this Complaint to allege said amount.  Lotus Herrera as Special Administrator of the Estate of Brian Fraser is also entitled to general damages and exemplary or punitive damages that decedent Brian Fraser would have recovered had he survived.

276.  Due to MGM's negligent conduct, Rachel Sheppard has been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

277.  Due to MGM's negligent conduct, the Fraser Plaintiffs have been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

278.  Due to MGM's negligent conduct, Lotus Herrera as Special Administrator of the Estate of Brian Fraser, has been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

279.  Due to MGM's negligent conduct, the Calzadillas Plaintiffs have been required to retain the services of Eglet Prince and Gallagher & Kennedy and to incur attorney's fees and costs thereby.

280.  Due to MGM's negligent conduct, Nicholas and Anthony Robone have been required to retain the services of Panish Shea and Boyle LLP and to incur attorney's fees and costs thereby.

### TENTH CLAIM FOR RELIEF

### Gross Negligence: Punitive Damages

281.  Plaintiffs reallege and incorporate by reference every allegation contained in this Complaint as though fully set forth herein.

282.  Plaintiffs allege that all acts, conduct and omissions on the part of MGM taken singularly or in combination, constitute gross negligence and were the proximate cause of Plaintiffs' injuries and damages.  MGM's acts and/or omissions, when viewed objectively from

- 54 -

1    MGM's standpoint at the time such acts and/or omissions occurred, involved an extreme degree

2    of risk, considering the probability and magnitude of the potential harm to others.  MGM had

3    actual, subjective awareness of the risk, but proceeded with conscious indifference to the rights,

4    safety and welfare of Plaintiffs.

5        283.    MGM's conduct was reckless and/or done with an intentional state of mind.  MGM

6    acted with deliberate indifference by ignoring countless signs of suspicion, as a result of focusing

7    its security on preventing theft against MGM, that, if noticed, would have prevented, or

8    significantly thwarted, the Shooter's efforts.  Such gross negligence was a proximate cause of the

9    occurrence and Plaintiffs' injuries and damages.

10       284.    That MGM acted recklessly, maliciously, and/or oppressively with intent to allow

11   injury to Plaintiffs.

12       285.    That MGM acted with conscious disregard for the safety of Plaintiffs, and others so

13   as to constitute malice and oppression, and Plaintiffs are entitled to exemplary or punitive damages

     in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

14       286.    As a direct and proximate result of all the foregoing and as a result of the willful

15   acts and/or willful omissions of MGM, Plaintiffs have sustained and will continue to sustain the

16   above-mentioned injuries and damages.

17       287.    As a direct and proximate result of MGM's willful and wrongful conduct, Plaintiffs,

18   each of them, suffered severe injury to their body and mind, past and future medical expenses, past

19   and future pain and suffering, past and future severe emotional distress, disfigurement, loss of

20   enjoyment of life, loss of past and future earning capacity and anticipated future loss of income,

21   all to their damage in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

22       288.    As a direct and proximate result of MGM's willful and wrongful conduct, and the

23   resulting death of Brian Fraser, Lotus Herrera as Special Administrator of the Estate of Brian

24   Fraser, has incurred emergency, medical, funeral and burial expenses in an amount not yet

25   ascertained, and when said amount is ascertained, Stephanie Fraser will seek leave of Court to

26   amend this Complaint to allege said amount.  Lotus Herrera as Special Administrator of the Estate

27   of Brian Fraser is also entitled to general damages and exemplary or punitive damages that

     decedent Brian Fraser would have recovered had he survived.

28

- 55 -

**FIRST AMENDED COMPLAINT**

289. Due to MGM's willful and wrongful conduct as alleged herein, Rachel Sheppard has been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

290. Due to MGM's willful and wrongful conduct, the Fraser Plaintiffs have been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

291. Due to MGM's willful and wrongful conduct as alleged herein, Lotus Herrera as Special Administrator of the Estate of Brian Fraser, has been required to retain the services of Robinson Calcagnie and the Lee Murphy Law Firm and to incur attorney's fees and costs thereby.

292. Due to MGM's willful and wrongful conduct as alleged herein, the Calzadillas Plaintiffs have been required to retain the services of Eglet Prince and Gallagher & Kennedy and to incur attorney's fees and costs thereby.

293. Due to MGM's willful and wrongful conduct, Nicholas and Anthony Robone have been required to retain the services of Panish Shea and Boyle LLP and to incur attorney's fees and costs thereby.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs Rachel Sheppard, individually; Stephanie Fraser, individually, Lotus Herrera as Special Administrator of the Estate of Brian Fraser, deceased; Stephanie Fraser, as the Guardian Ad Litem for Aubree Fraser, a minor; Stephanie Fraser, as the Guardian Ad Litem for Brayden Fraser; Jovanna Calzadillas, individually; Francisco Calzadillas, individually; Nicholas Robone, individually; and Anthony Robone, individually, pray for relief in the form of a Judgment in their favor, and against MGM for damages as follows:

1) For compensatory damages to be shown at trial;

2) For actual and/or special damages to be shown at trial;

3) For general damages to be shown at trial;

4) Loss of past and future earning capacity;

5) Loss of enjoyment of life;

- 56 -

**FIRST AMENDED COMPLAINT**

6) Pecuniary damages, including, but not limited to grief or sorrow, loss of probable support, companionship, society, comfort, pain and suffering and disfigurement of Brian Fraser;

7) For punitive and exemplary damages against Defendants in an amount to be determined at trial;

8) For costs of suit, reasonable attorney's fees, and interest;

9) For pre-judgment and post-judgment interest;

///

///

///

///

///

///

///

///

- 57 -

**FIRST AMENDED COMPLAINT**

Case 2:18-cv-05564-JAK-FFM Document 24-2 Filed 07/10/19 Page 77 of 78 Page ID
Case 2:18-cv-01120-RFB-VCF Document 9 Filed 06/29/18 Page 59 of 60 Page ID
#:498

1    10)    For such other and further relief as the Court may deem just and equitable under the

2    circumstances.

3    Dated: June ___, 2018

4    BY:

5

6    Robert T. Eglet
    Nevada Bar No. 3402
    Robert M. Adams

7    Nevada Bar No. 6551
    **EGLET PRINCE**

8    400 S. Seventh St., Suite 400
    Las Vegas, NV 89101

9    (702) 450-5400; Fax: (702) 450-5451

10    eservice@egletlaw.com
    *-and-*

11    Patrick McGroder III
    Arizona Bar No. 002598

12    (*Nevada pro hac pending*)
    **GALLAGHER & KENNEDY**

13    2575 East Camelback Road

14    Phoenix, AZ 85016
    (602) 530-8000; Fax (602) 530-8500

15    pjm@gknet.com
    *Attorneys for Plaintiffs Jovanna and Frank*

16    *Calzadillas*

17

18    Kevin R. Boyle
    (*Nevada pro hac pending*)

19    California Bar No. 192718
    Rahul Ravipudi

20    Nevada Bar No. 14750
    Gregorio V. Silva

21    Nevada Bar No. 13583

22    Ellin Mardirosian
    Nevada Bar No. 14399

23    **PANISH SHEA & BOYLE LLP**

24    8816 Spanish Ridge Avenue Las Vegas,
    NV 89148

25    (702) 560-5520; Fax: (702) 975-2515
    boyle@psblaw.com

26    *Attorneys for Plaintiffs Nicholas and*
    *Anthony Robone*

27

28

Mark P. Robinson, Jr.
California Bar No. 54426
(*Nevada pro hac pending*)
Daniel S. Robinson
California Bar No. 244245
(*Nevada pro hac pending*)
**ROBINSON CALCAGNIE, INC.**
19 Corporate Plaza Drive
Newport Beach, CA 92660
(949) 720-1288; Fax (949) 720-1292
mrobinson@robinsonfirm.com
Richard K. Hy
Nevada Bar No. 12406
(*Nevada local counsel*)
**EGLET PRINCE**
400 S. Seventh St., Suite 400
Las Vegas, NV 89101
(702) 450-5400; Fax: (702) 450-5451
*-and-*
James Lee
(*Nevada pro hac pending*)
Texas Bar No. 2404131
**LEE MURPHY LAW FIRM**
440 Louisiana St. #300
Houston, Texas 77002
(713) 275-6990; (713)-275-6991
jlee@leemurphylaw.com

*Attorneys for Plaintiffs Rachel Sheppard;*
*Stephanie Fraser; Lotus Herrera as Special*
*Administrator of the Estate of Brian Fraser;*
*Stephanie Fraser, as the Guardian Ad Litem for*
*Aubree Fraser and Brayden Fraser*

- 58 -

**FIRST AMENDED COMPLAINT**

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand trial by jury of all claims and causes of action in this lawsuit to which they are so entitled.

Dated: June _____, 2018

BY:

Robert T. Eglet
Nevada Bar No. 3402
Robert M. Adams
Nevada Bar No. 6551
**EGLET PRINCE**
400 S. Seventh St., Suite 400
Las Vegas, NV 89101
(702) 450-5400; Fax: (702) 450-5451
eservice@egletlaw.com
-and-
Patrick McGroder III
Arizona Bar No. 002598
(*Nevada pro hac pending*)
**GALLAGHER & KENNEDY**
2575 East Camelback Road
Phoenix, AZ 85016
(602) 530-8000; Fax (602) 530-8500
pjm@gknet.com
*Attorneys for Plaintiffs Jovanna and Frank Calzadillas*

Kevin R. Boyle
(*Nevada pro hac pending*)
California Bar No. 192718
Rahul Ravipudi
Nevada Bar No. 14750
Gregorio V. Silva
Nevada Bar No. 13583
Ellin Mardirosian
Nevada Bar No. 14399
**PANISH SHEA & BOYLE LLP**
8816 Spanish Ridge Avenue Las Vegas, NV 89148
(702) 560-5520; Fax: (702) 975-2515
boyle@psblaw.com
*Attorneys for Plaintiffs Nicholas and Anthony Robone*

Mark P. Robinson, Jr.
California Bar No. 54426
(*Nevada pro hac pending*)
Daniel S. Robinson
California Bar No. 244245
(*Nevada pro hac pending*)
**ROBINSON CALCAGNIE, INC.**
19 Corporate Plaza Drive
Newport Beach, CA 92660
(949) 720-1288; Fax (949) 720-1292
mrobinson@robinsonfirm.com
Richard K. Hy
Nevada Bar No. 12406
(*Nevada local counsel*)
**EGLET PRINCE**
400 S. Seventh St., Suite 400
Las Vegas, NV 89101
(702) 450-5400; Fax: (702) 450-5451
-and-
James Lee
(*Nevada pro hac pending*)
Texas Bar No. 2404131
**LEE MURPHY LAW FIRM**
440 Louisiana St. #300
Houston, Texas 77002
(713) 275-6990; (713) 275-6991
jlee@leemurphylaw.com

*Attorneys for Plaintiffs Rachel Sheppard; Stephanie Fraser; Lotus Herrera as Special Administrator of the Estate of Brian Fraser; Stephanie Fraser, as the Guardian Ad Litem for Aubree Fraser and Brayden Fraser*

- 59 -

**FIRST AMENDED COMPLAINT**